PRICE VS. THE WISCONSIN MARINE & FIRE INSURANCE COMPANY.

43   267
95   664
43   267
114   578

WAREHOUSE RECEIPT: FACTOR: PLEDGE. *(1, 2) Power of factor to pledge negotiable warehouse receipt. (3) Private warehouses comprehended in the act. (4) Rule as to merchandise in factor's hands.*

1. Under both the Warehouse Receipt Act (ch. 340 of 1860, as amended by ch. 73 of 1863) and the Factors' Act (ch. 91 of 1863), if a principal empowers his factor to purchase and retain a negotiable warehouse receipt, or transfers to him possession of such receipt, the factor, having the apparent legal title (though clothed with a trust toward the principal), has power not only to sell but to *pledge* the receipt to one dealing with him in good faith; and notice that he holds the receipt as a factor is not notice of any limit of his power, as between him and his principal, to sell or pledge it; though such sale or pledge will not bind the principal if the vendee or pledgee has notice that it is made in violation of the principal's instructions.

[2. Certain *dicta* in *Hale v. Dock Co.*, 29 Wis., 482, criticised.]

3. The term "warehouse keeper's receipt," in the Factors' Act of this state, must be understood as applying to private warehouses, and not merely to custom-house or bonded warehouses, however it may be construed in the Factors' Act of New York.

[4. Whether the rule above stated applies to *merchandise*, possession of which, without documentary evidence of title, is intrusted to a factor "for the purpose of sale, or as security for advances to be made," somewhat considered, but not involved in this case.]

APPEAL from the County Court of *Milwaukee* County.

Action for damages for the conversion of two warehouse receipts and the grain covered by them. The defendant company has been engaged for many years in a general banking business in the city of Milwaukee. One Watson, a commission merchant in that city, purchased with plaintiff's funds, for the plaintiff, and under his direction, January 2, 1876, two thousand bushels of wheat, and received therefor the receipts in question. They were in the usual form, stating that the wheat was "received in store from" persons named, "for account of bearer," "subject to storage, and deliverable on

return of this receipt." They were held by Watson subject to the plaintiff's order, for sale or otherwise; and plaintiff never gave Watson any directions in regard to the disposition of them. Watson had transacted his banking business with the defendant for ten or twelve years; and his account had been overdrawn since November, 1875. On the 13th of January, 1876, defendant refused him permission to still further over-draw his account without a deposit of collaterals; and he thereupon deposited said two warehouse receipts as security. While they still remained with defendant as such security, Watson died insolvent, February 21, 1876. On the 26th of the same month, plaintiff first ascertained that the receipts were in defendant's possession, and made demand therefor, which was refused; and on the same day defendant sold the receipts, and placed the amount realized to Watson's credit, leaving a balance still due from him to defendant. There-upon this action was brought.

On the trial, defendant's assistant cashier testified as fol-lows: " I have known receipts like these to be in use in the city of Milwaukee about eighteen years; defendant has been in the habit, from day to day, ever since that time, of advanc-ing money in large amounts upon receipts of that character; the amount so advanced in a year is millions; the wheat business alone amounted to twenty-eight millions of bushels, without counting the coarser grains. Such receipts are the documents which commission merchants in the city of Milwaukee give to bankers as collateral security for loans and advances made to them in their business. There are no other documents of title to property that I know of, that are in use on the floor of the chamber of commerce in Milwaukee, in the ordinary business transactions of that chamber, than warehouse re-ceipts in form like these. * * * At the time I took the receipts for the bank, I had not the remotest knowledge that the plaintiff had any interest therein. * * * These receipts are used in business just like government bonds or

anything of that kind; they pass from hand to hand without indorsement, by simple delivery; there has never been any question about that." On his cross examination, the witness testified as follows: "Q. You knew that Watson was receiving grain from the country, and these receipts were things he was holding for outside parties? A. Not at all. He sent large amounts of money to the country, and I supposed these receipts were receipts that he had paid for with money that he had overdrawn. Q. Didn't you know that as a rule he was receiving grain from parties in the country? A. Yes, sir, that was his business. Q. And that the receipts he would get would be for grain shipped to him? A. I don't know; mostly all these men, although they say they do not, deal on their own account somewhat, and I did not know that he was an exception to the rule. None of them do it, to take their word; but there are very few of them but what do do it. Q. I ask whether these receipts that he would get would be for grain shipped from the country to him? A. Yes, generally speaking. Q. And if he was dealing on his own account, he would not tell you about it? A. I suppose not." On his further direct examination, he testified as follows: "A commission merchant in Milwaukee receives grain for sale; he also advances money on grain that is consigned to him at the city of Milwaukee. Q. In his transactions with your bank, how does he procure the money to pay those advances? A. He borrows it of the bank. Q. To pay the advance on the very identical property that is sent here for him to sell? A. Yes, in many instances. * * * All commission merchants keep their accounts in their name. As fast as he wants money, he brings in the warehouse receipts, and the banks and brokers lend on the faith and credit of the receipts, and he checks out the money payable to whom he pleases. They often receive bills of lading from the interior giving the property directly to them by the terms of the bills of lading. In that case, he stores that property in an elevator, and gets a

warehouse receipt in his own name, and that receipt he brings to the bank, and receives a discount on it if he wants it; that is the usual course of business in all the banks of this city."

Plaintiff admitted that the banks in the city of Milwaukee advance money on these warehouse receipts in the manner above described, and that these receipts pass from hand to hand by delivery at the board of trade and in the city, and are used on sales of and advances upon the property mentioned in them.

There was no dispute that defendant knew that Watson was a factor or commission merchant, and that it took the receipts without inquiry as to their ownership; and there was no evidence or claim of any other fact than those above mentioned, tending to show an absence of good faith in the transaction.

The verdict was special, consisting of answers to numerous questions submitted to the jury. The answers to be given to most of these were stipulated by the parties. The following questions, however, were submitted against defendant's objection: "8. Did defendant have reasonable cause to believe that Watson was not the owner of the warehouse receipts, when he deposited them at the bank? 9. Did defendant know, or had it reasonable cause to believe, at the time of the deposit of the warehouse receipts, that they were held by Watson as an agent for some other person? 11. Was the transaction upon the part of the bank one in good faith?" The jury first answered all these questions in the affirmative. The judge, however, with the consent of counsel, stated to the jury that in his opinion the answers were inconsistent; that if they should answer the 8th and 9th questions affirmatively, they must answer the 11th negatively, and *vice versa*. Defendant excepted to this instruction. The jury afterwards brought in affirmative answers to the 8th and 9th, and a negative answer to the 11th question; a new trial was refused, and judgment entered for the plaintiff upon the special verdict; and defendant appealed.

For the appellant, a brief was filed by *Finches, Lynde & Miller*, with a supplemental brief by *Mr. Lynde*, and there was oral argument by *H. M. Finch*. They contended, 1. That it was clear, from the undisputed evidence, that receipts like those in question have become, by general usage and course of business, negotiable, passing from hand to hand without indorsement, like government bonds or other negotiable securities; and that, upon this ground alone, a *bona fide* holder for value is entitled to protection (1 Smith's L. C., 259; 1 Parsons on N. & B., 274; *Goodwin v. Robarts*, L. R:, 10 Exch., 76, 337, 352; *S. C.*, 3 Cent. L. J., 621; *Mercer Co. v. Hacket*, 1 Wall., 95; *Crosby v. Roub*, 16 Wis., 628); that the rule which makes assignments of choses in action subject to equities existing between the original parties to the contract, must yield when a contrary intention appears from the nature or terms of the contract *(In re A. & G. Bank*, L. R., 2 Ch., 391), and such contrary intention is shown here by the terms of the receipts making the wheat deliverable *to the bearer* on the *return of the receipt (In re Blakely Ordnance Co.*, L. R., 3 Ch. App., 159); and that one who has entrusted another with the evidences of title to property cannot recover against another who has made advances thereon in good faith. 3 Cent. L. J., 824; *Holbrook v. N. J. Zinc Co.*, 57 N. Y., 622; *McNeil v. Tenth Nat. Bk.*, 46 id., 325. 2. That warehouse receipts are negotiable by virtue of ch. 340, Laws of 1860, and ch. 73, Laws of 1863. *Whitlock v. Hay*, 58 N. Y., 487. Counsel insisted that this was a necessary result, not only of the language of those acts, but of the view taken in *Rice v. Cutler*, 17 Wis., 351; and criticised some things said in *Hale v. Dock Co.*, 29 id., 500. 3. That by sec. 3, ch. 91, Laws of 1863 (the Factors' Act), Watson was to be deemed the true owner of the warehouse receipts so far as to give validity to his pledge. That act is an exact copy of the Factors' Act of New York; and the construction given it by the New York courts will be followed here. *Wiesner v. Zaun*, 39 Wis., 205.

As to the New York construction, counsel cited *Howland v. Woodruff*, 60 N. Y., 73, opinion of ALLEN, J.; *Stevens v. Wilson*, 6 Hill, 514; *S. C.*, 3 Denio, 479. 4. That if the receipts were negotiable by custom or by the warehouse act, there was no sufficient evidence to impeach them in defendant's hands. *Plumb v. Fluitt*, 2 Anst., 433; *Murray v. Lardner*, 2 Wall., 110; *Hamilton v. Marks*, 3 Cent. L. J., 740; *Reeve v. Ins. Co.*, 39 Wis., 520. 5. That under the Factors' Act, plaintiff, by investing Watson with the possession of the receipts, made him the owner of them, and authorized him to pledge them as he did, to one who made advances on the faith of them; that there was no evidence to support a finding that defendant had reason to believe that Watson was not the owner; and that mere knowledge that he was an agent or factor was no evidence, under the act, to impeach the good faith of the transaction on defendant's part.

For the respondent, briefs were filed, signed by *Williams & Merrill* as his attorneys, and by *David S. Wegg*, of counsel, and the cause was argued orally by *Mr. Wegg*. They contended, 1. That while warehouse receipts are *quasi* negotiable, in that the title to the property represented by them may be transferred by their delivery, with or without indorsement, yet they are not negotiable, like bills of exchange and promissory notes, *so as to exclude equities* and vest an absolute indefeasible title in the vendee or pledgee, in the absence of *mala fides;* that negotiability in the latter sense is confined at the common law to instruments for the payment of *money only*, and never extended to instruments representing chattels, not even to certificates of deposit payable in *current funds* (*Ford v. Mitchell*, 15 Wis., 304; *Platt v. Sauk Co. Bank*, 17 id., 222; *Lindsay v. McClelland*, 18 id., 481; *Mechanics' Bank v. Railroad Co.*, 13 N. Y., 599, 627–8; *Railroad Co. v. Howard*, 7 Wall., 392, 415; *Commercial Bank of Rochester v. Colt*, 15 Barb., 506; *Second Nat. Bank v. Walbridge*, 19 Ohio St., 419; *Burton v. Curyea*, 40 Ill., 320); that no cus-

Price vs. The Wisconsin Marine & Fire Ins. Co.

tom or usage of trade arising of late years, nor even express contract of the parties, can make documents of title to chattels negotiable in this sense *(Crouch v. Credit Foncier, etc.,* L. R., 8 Q. B., 374, and cases there cited); and that, even if these receipts could become thus negotiable by usage of trade, it must be shown that the usage was general and immemorial, or that plaintiff knew it and contracted with reference to it. 2. That defendant is not protected by sec. 6, ch. 340 of 1860, as amended by ch. 73 of 1863 (the Warehouse Receipt Act). (1) Under that act the receipt must be *transferred* by being voluntarily delivered *by the owner.* At first the *owner's in-dorsement* was required *(Rice v. Cutler,* 17 Wis., 358); but since the amendment of 1863, he may transfer it by actual and voluntary delivery without indorsement. But there was no such delivery of the receipts in this case by plaintiff to Watson. Watson took the receipts from the warehouseman, as the agent of plaintiff; their delivery to Watson was a delivery to plaintiff; and they were never *transferred* by the latter. (2) The statute protects the transaction only when entered into in good faith on the part of the pledgee; the rules as to good faith in such a transaction are those which apply to the transfer of other articles of personal property (and not those applicable to instruments negotiable by the law merchant); and when the purchaser or pledgee has good reason to believe, from all the facts and circumstances, that the person offering to sell or pledge does not own the goods, he does not act in good faith, and is not protected. *Rice v. Cutler, supra; Hale v. Dock Co.,* 29 Wis., 482. (3) If this construction of the Warehouse Receipt Act is erroneous, then the provisions of that act, so far as they relate to factors and are inconsistent with the Factors' Act (ch. 91, Laws of 1863), are virtually repealed by it (Sedgw. Stat. & Con. Law, 98; *Crane v. Reeder,* 22 Mich., 334; *Comm'rs v. Potts,* 10 Ind., 286; *Comm. v. Comm'rs,* 40 Pa. St., 348; *Gwinner v. R. R. Co.,* 55 id., 126; *People v. Mayor,* 32 Barb., 121; *State v. Clarke,.*

1 Dutch., 54; *State v. Kelley*, 34 N. J. Law (5 Vroom), 75; *Titcomb v. Ins. Co.*, 8 Mass., 326; *Western B'k v. Tallman*, 17 Wis., 547); and even if not in terms inconsistent, yet, being a revision of the subject matter, and plainly intended to prescribe the only rule, the latter act operates as a repeal. *Comm. v. Kelliher*, 12 Allen, 480; *Weeks v. Walcott*, 15 Gray, 54; *Comm'rs v. McComb*, 19 Ohio St., 345; *Swann v. Buck*, 40 Miss., 268; *Sacramento v. Bird*, 15 Cal., 294; *Burlander v. Railroad Co.*, 26 Wis., 76.   3. That defendant was not protected under ch. 91 of 1863.   At common law there was practically an absolute bar to a pledge by a factor of the goods of his principal, and if such pledge were made, the principal might immediately maintain an action for the goods or their value against an innocent pledgee. *Paterson v. Tash*, 2 Strange, 1178; *Daubigny v. Duval*, 5 Durnf. & East, 604; *Boyson v. Coles*, 6 Maule & Sel., 14; *Graham v. Dyster*, id., 1; *Martini v. Coles*, 1 id., 147; *Shipley v. Kymer*, id., 484; *Queiroz v. Trueman*, 3 Barn. & Cress., 342; *Fielding v. Kymer*, 2 Brod. & Bing., 639; *Newsom v. Thornton*, 6 East, 17. These principles have been adopted in this country to the full extent, when not modified by statute.   *Warner v. Martin*, 11 How. (U. S.), 209; *Mich. State Bank v. Gardner*, 15 Gray, 362; *Kinder v. Shaw*, 2 Mass., 398; *Bowie v. Napier*, 1 McCord, 1; *Rodriquez v. Heffernan*, 5 Johns. Ch., 429; *First Nat. Bank of Macon v. Nelson*, 38 Ga., 391; *Hadwin v. Fisk*, 1 La. An., 74; *Bott v. McCoy*, 20 Ala., 578.   Great complaint was made of this doctrine, on the ground that where the factor had the power of sale, he ought to have the right to pledge, so far as to protect a person advancing money upon the goods *under a full belief that the factor held them as owner*, upon the principle that where one of two *innocent* persons must suffer, he who places his agent in such a position that he may commit the fraud, should bear the loss.   Abbott on Shipping (5th Am. ed.), 646; McCullough's Com. Dic., title "Factor," p. 641.   For the correction of these evils, parliament enacted 4

Geo. IV, c. 83, and 6 Geo. IV, c. 94. The second section of that act expressly provided that the pledgee should be allowed to retain the documents of title against the true owner only when he had not notice "by such documents or either of them or *otherwise*, that the pledgor was not the actual and *bona fide* owner." The object of this section was to protect the pledgee only for advances made the factor on the faith of such a deposit *without knowledge that he was a factor* (Russell on Factors, 124); and it was held by the English courts not to protect the pledgee when he had good reason to believe, from the circumstances of the case, that he was dealing with a mere agent. *Evans v. Trueman*, 1 Mood. & Rob., 10; Russell on Factors, 139; Paley on Agency, by Lloyd, 226. This continued to be the law of England until 1842, when a radical change was made by 5 and 6 Vic., c. 39, which protects the pledgee, notwithstanding he "may have had notice that the person with whom such contract or agreement is made is only an agent." The New York Factors' Act of 1830 was founded on 6 Geo. IV, c. 94; and sec. 3 of the New York act is almost identical with sec. 2 of the latter act, but with an omission of the clause relating to notice. Notwithstanding this omission, the New York courts held that the words "upon the faith thereof" require the pledgee to have made his advances upon the faith that the pledgor was the true owner of the property, and they construed the act as not protecting such pledgee where he knew that the pledgor held the property as a mere agent. *Stevens v. Wilson*, 6 Hill, 512; *S. C.*, in court of errors, 3 Denio, 472; *Covill v. Hill*, 4 id., 330; *S. C.*, 2 Seld., 380; *Zachrisson v. Ahman*, 2 Sandf. S. C., 68, 75; *Bonito v. Mosquera*, 2 Bosw., 401, 431; *Cartwright v. Wilmerding*, 24 N. Y., 521, 532, 534; *Warner v. Martin*, 11 How., U. S., 209; see also *Macky v. Dillinger*, 73 Pa. St., 85. This section was adopted *verbatim* in this state, in ch. 91 of 1863, and must be taken to have been adopted with the construction previously given it in New York. *Perkins v. Simonds*, 28 Wis., 90;

*Wiesner v. Zaun*, 39 id., 205.  The decisions upon the New York statute in 60 N. Y., 73, 61 id., 283, and 10 Bosw., 505, were long subsequent to the passage of the act in this state, and have no effect upon the construction here.  And the construction already stated rests, besides, on the broad principle that a statute (at least where the words do not clearly and necessarily require it) will not be so construed as to *legalize fraud*.  Sedgw. Stat. & Con. Law, 315; *Hale v. Dock Co.* and *Rice v. Cutler, supra; Burnham v. Fond du Lac*, 15 Wis., 193; *Buffham v. Racine*, 26 id., 449; *Haentze v. Howe*, 28 id., 293; *Thompson v. State*, 20 Ala., 54; *Ex parte Ellis*, 11 Cal., 222; *Tonnele v. Hall*, 4 Coms., 140; *Keith v. Quinney*, 1 Oregon, 364.

RYAN, C. J.  This appeal was twice argued, at great length and with great learning and ability, by counsel on both sides.  It is impossible, within proper limits, to review all the collateral positions taken, or to trace principles remotely bearing on the question, through the wilderness of cases cited.  Nor is it necessary.  Whatever light we have been able to derive from those cases, the question after all rests upon the construction of two statutory provisions, which appear to us unambiguous in themselves, and to be confused only by ingenious misconstruction.  This sometimes happens through undue love of " the perfection of human reason," and professional adherence to the rules of the common law against reasonably explicit statutes designed to change them.  It is our duty, however, to give effect to the express intent of the legislature, when we find it in a statute, unless the effect be perverted beyond our control by judicial decision.

A factor is an agent to buy or to sell.  A factor, says Judge Story, differs from a broker in some important particulars.  A factor may buy and sell in his own name, as well as in the name of his principal.  A broker buys and sells in the name of his principal.  A factor is entrusted with the possession,

control and disposal of the goods to be bought or sold, and has a special property in them and lien on them. A broker usually has no such possession, control or disposal, and therefore no such special property or lien. Story's Ag., § 34.

A factor buying goods for his principal in his own name, is personally liable for the price. A factor selling goods for his principal in his own name, can sue in his own name for the price. And the sale of a factor, with general authority, binds his principal, though made in violation of instructions unknown to the purchaser. Ib., § 110.

But a factor, at the common law, could not generally bind his principal by pledge of the principal's goods for the factor's benefit; though he might pledge the goods and bind his principal to the extent of his own lien. Ib., §§ 113, 225.

Cases indeed might arise, adds the same great authority, in which the principal might be bound; as if he had clothed the factor with all the apparent muniments of an absolute title, and authorized him to dispose of the property, as sole owner, and the pledgee had no notice of the agency. Ib., § 227.

So a factor may bind his principal, contrary to his instructions, by pledge of negotiable securities or instruments; because the title is derived from the securities or instruments themselves. "But the better reason is that the principal, in all such cases, holds out the agent as having an unlimited authority to dispose of and use such instruments as he may please. And indeed, negotiable instruments, when indorsed in blank or payable to bearer, are treated as a sort of currency, and pass in the market without inquiry as to the title of the holder; and the negotiability of all instruments would be greatly impaired, if not wholly destroyed, by a different doctrine." Ib., § 228. As another writer states the ground of the distinction, "from reasons of public policy, the mere possession of negotiable paper carries with it an imperative presumption of title and power of disposal." Story on Sales, § 106.

So far as it is important to the question here, this seems to us a sufficient summary of the powers of factors at the common law. And it is apparent that the rules were inconvenient in practice, if altogether just in principle. For they vest in the factor an apparent legal title, often subordinate to the instructions of his principal; make the apparent right of a factor greater than his legal right; his apparent power greater than his real power. They put it in a factor's power sometimes to overreach an innocent party, by the apparent title in himself with which his principal has entrusted him. The reason for the distinction in the power of a factor entrusted by his principal with negotiable paper, and entrusted with other commodities, cannot perhaps be accepted as altogether satisfactory. As seen, the rule applicable to negotiable paper was sometimes applied to commodities accompanied with apparent muniments of title. It might perhaps have been safer and juster to apply to all commodities in the hands of a factor with apparent title, the same rule applied to negotiable paper. For if one of two innocent parties must suffer by the wrong of another, it ought generally to be the party whose confidence makes the wrong possible. The confidence reposed by a principal in a factor is voluntary and great. A factor may be entrusted with power to pledge as well as to sell; notice that a factor holds his apparent title as such, does not necessarily imply notice of the limits of his authority; and mere notice that he is a factor should not, perhaps, in any case, as it did not in all cases, charge one with whom he deals with notice of his private instructions. When one dealing with a factor has notice in fact of his want of authority, the transaction is equally fraudulent as against the principal, whether it be sale or pledge. And the distinction at common law between the power of a factor, clothed with apparent title, to sell and to pledge, proved in time to be a serious inconvenience in mercantile communities.

So it was in England. "As has been already observed, the

restrictions thus imposed upon the power of a factor to pledge were far from receiving the unanimous approval of the bench; whilst, among mercantile men, an almost universal opinion was entertained to the effect that a factor or commercial agent, entrusted by his principal with the possession of or the *indicia* of property in goods, should be deemed to be the true owner thereof, in respect of third persons dealing with him fairly in the course of business, whether they dealt with him as purchasers or pawnees, provided they were in ignorance of his real character. The result of this opinion was, that the matter was brought under the notice of the legislature, and accordingly, in the year 1823, a statute was passed, by the provisions whereof the law was very considerably modified." Russell on Factors, 122.

This was the first of the so called English Factors' Acts, 4 Geo. IV, c. 83, followed by 6 Geo. IV, c. 94, and finally by 5 and 6 Vic., c. 39. The first was not improbably intended by parliament to work the change in the law finally accomplished by the last. It was, however, so far defeated of its object by judicial construction, that all or most of its provisions appear to have been held subordinate to the rules of the common law. A review of the struggle which ensued between legislation and construction would be interesting and instructive; but it is unnecessary, and would extend this opinion beyond reasonable length. Mr. Russell gives it to the date of his work. He remarks of 6 Geo. IV, c. 94: " Our courts have evinced no disposition to relax the rules of the common law with reference to pledges by factors, any further than they were warranted in doing by a very literal construction of the statute in question. Indeed the reader cannot have failed to observe that the result of all the decisions to which we have adverted in the course of the above summary, was unfavorable to the rights of pawnees; and perhaps it has occurred to him, that, owing to the interpretation which our courts appear to have felt themselves bound to give the statute in question, innocent third parties

were, notwithstanding its provisions, as much exposed to risk in making advances to factors as they had been before that statute came into existence." Ib., 140.

The subsequent English cases cited by counsel on both sides here, give an impression that it cannot perhaps be considered uniformly and finally settled there, in some respects, how far the rules of the common law have been effectually modified by the several statutes on the subject. Without reviewing them at length, it is perhaps sufficient to say here that the late English cases appear very generally to concur in the rule, that where a principal entrusts a factor with all the *insignia* of title, the pledge of a factor to a pledgee acting in good faith will bind the principal.

We have, however, given this hasty glance at the history of the law in England, mainly to show that the necessities of trade in the great commercial communities of that country have persistently and successfully called for a change of the law regulating the powers of factors, in favor of persons dealing in good faith with them, against strong judicial preference for the rules of the common law.

Some of the commercial states in the Union seem to have had a similar experience. In this state, the common law remained unaltered until the convenience of trade, so great as to be a practical necessity, called for the passage of the Warehouse Receipt Act, ch. 340 of 1860, amended by ch. 73 of 1863, and of the Factors' Act, ch. 91 of 1863. The amendment of sec. 6 of the Warehouse Receipt Act and the Factors' Act were passed within four days; conclusive evidence that the inconvenience of the common law and the necessity of obviating it were very fully in the mind of the legislature. And the controlling question on this appeal is the true construction of sec. 6 of the Warehouse Receipt Act, and sec. 3 of the Factors' Act.

I. Sec. 6 of the Warehouse Receipt Act, as amended in 1863,[1]

---

[1] The section above referred to reads as follows: "Section 6. Warehouse

so far as we have concern with it here, provides that warehouse receipts, bills of lading or railroad receipts given for goods, etc., may be transferred by delivery, with or without indorsement; that the person to whom they are so transferred shall be deemed and taken to be the owner of the goods, etc., so far as to give validity to pledge or transfer of the goods by the holder; and that warehouse receipts, etc., shall be surrendered and canceled on delivery of the goods, etc.

It is difficult for us now to understand how there has been any misapprehension of the legistative intention, in this section, to make warehouse receipts negotiable, with like effect as to title as negotiable paper for the payment of money. Before the statute they were *quasi* negotiable, and passed from hand to hand as title papers to the goods, as held in *Rice v. Cutler* and *Hale v. Dock Co.*, *infra*. The section of 1860 made them negotiable by indorsement; the section of 1863, by delivery, with or without indorsement; manifesting a deliberate purpose of the legislature that they should pass from hand to hand, with title, by the easiest possible process of negotiation. This is the more marked by the distinction between negotiable and non-negotiable receipts; the section expressly providing for both kinds. A distinction was indeed attempted to be drawn at the bar, that the statute provides

receipts, bills of lading, or railroad receipts, given for any goods, wares, merchandise, lumber, timber, grain, flour or other produce or commodity, stored, shipped or deposited with any warehouse-man, wharfinger, vessel, boat or railroad company, or other person, may be transferred, by delivery, with or without indorsement thereof; and any person to whom the same may be so transferred, shall be deemed and taken to be the owner of the goods, wares and merchandise therein specified, so far as to give validity to any pledge, lien or transfer made or created by such person or persons; but no such property shall be delivered, except on surrender and cancellation of said original receipt or bill of lading, or the indorsement of such delivery thereon, in case of partial delivery. All warehouse receipts, bills of lading, or railroad receipts, however, which shall have the words 'not negotiable,' plainly written or stamped on the face thereof, shall be exempt from the provisions of this act."

that the delivery shall pass the title to the goods, not to the receipt itself. This appears to us to be an oversight. The transfer by delivery of the statute means that the receipt shall be negotiable, and negotiable paper always goes with title to the holder by negotiation. Negotiable quality imports negotiable title. And accordingly the holder of a warehouse receipt, under the section, takes not only title to the goods, but takes the receipt and surrenders it for cancellation upon delivery of the goods; plainly implying title of the holder in the paper itself, and excluding title in any previous holder.

It is quite true that the distinction appears to rest on some things said in a learned and ingenious discussion of Dixon, C. J., in *Hale v. Dock Co.*, 29 Wis., 482. But the precise question of negotiability was not properly in that case. That case turned upon the effect of negotiation, not upon negotiability; upon the liability of the warehouseman to a subsequent holder, for misdescription of the goods in a warehouse receipt, arising by mistake or fraud, without fault of the warehouseman. The court held, upon both appeals, that if the warehouseman had been in fault in the misdescription, he would have been liable to an innocent holder for the goods described in the warehouse receipt; but that, not being so in fault, he was only liable for the identical goods for which he actually gave the receipt. So that the question did not turn upon the title of the holder of the warehouse receipt, but upon the extent of the warehouseman's liability upon it. So far only was the negotiability of the warehouse receipt in question in that case. And we cannot now understand that the question and judgment on the second appeal were different from the question and judgment on the first appeal. *Hale v. Dock Co.*, 23 Wis., 276. It is true that both judgments hold the liability of the warehouseman to an innocent holder different from the liability of the maker of a promissory note or the acceptor of a bill of exchange. But this is not essentially in-

consistent with the negotiability of warehouse receipts, or the absolute title of the holders to the contracts as well as to the goods, or their right of action upon them as holders and owners. The title to the contract of a warehouse receipt, while it remains in force, must be in some one. It cannot be *in nubibus* or *in gremio legis*. " Justice does not require, nor does the law tolerate such an absurdity." So says the chief justice in his admirable judgment in *Welch v. Sackett*, 12 Wis., 243. The receipt runs to bearer, and the title is in the holder, who takes with it the right to the goods, the right to the contract and the right to extinguish the contract.

It is quite evident from the whole discussion upon the second appeal of *Hale v. Dock Co.*, that the Warehouse Receipt Act was wholly overlooked until the motion for a rehearing. The right of the holder under other statutes is discussed, without allusion to that statute. The cases cited in support of the doctrine asserted, turn upon instruments not negotiable by statute. And it is remarkable that the opinion quotes the language of Shaw, C. J., in *Blanchard v. Page*, 8 Gray, 297, stating that the English statute, 18 and 19 Vic., c. 111, makes bills of lading negotiable, but could not affect the law here; and cites *Valieri v. Boyland*, L. R., 1 C. P., 382, and *Jessel v. Bath*, L. R., 2 Ex., 267, turning upon that statute and recognizing the negotiability of bills of lading under it.

It is quite true that the Warehouse Receipt Act was called directly to the attention of the court by the motion for rehearing; and that the chief justice adheres to the doctrine in the principal opinion. He declares, in effect, that warehouse receipts were as negotiable before the statute as after it, and that the statute has no effect upon them. This is not altogether consistent with some things said in the principal opinion; and, we all think now, was misconstruction of the statute, and unnecessary in the case. Our love of the common law will not warrant so summary a disposition of the positive terms of a statute modifying it. The true answer to the mo-

tion for rehearing was, that the negotiability of the warehouse receipt had not such an effect upon the liability of the warehouseman as to charge him in that case; as held upon bills of lading in *Valieri v. Boyland* and *Jessel v. Bath, supra.* It is only justice to ourselves to say that we all entertain the deference for the judgments of the chief justice due to his singular learning and ability. But we cannot but think it unfortunate that his judgment of this statute seems really to have been given before the statute was within his attention, and tends to confound *quasi* negotiability by custom with negotiability by as high and ample authority as the statute of Anne itself.

It is, perhaps, sometimes too easy for a common lawyer to overlook the distinction between familiar but conventional rules of the common law, in which he is educated, and rules of necessity *in rerum natura.* So lifelong habits of reasoning are somewhat apt to give the impression that paper for the payment of money only can be negotiable; perhaps not always remembering that all paper for the payment of money is not negotiable, and that the same power which made promissory notes negotiable, can make equally negotiable paper representing commodities of trade. Whether the court was right or wrong in *Hale v. Dock Co.*, in distinguishing the liability of a warehouseman upon his receipt, from the liability of the maker upon a promissory note, to a holder without notice, is not in this case; and we intend to imply no doubt of the judgment in that case. But in that case and in this, the court was and is as much bound to recognize the negotiability of warehouse receipts under the Warehouse Receipt Act, as the negotiability of promissory notes under the statute of Anne. It is for the legislature *jus dare*, for the court *jus dicere.*

Some things inconsistent perhaps with our present views of the statute were said in *Shepardson v. Green*, 21 Wis., 546; but we understand those things to be unsaid on the second appeal of that cause. *Shepardson v. Cary*, 29 Wis., 34. And

we are not aware that the precise question here has been before the court in any previous case.

We now hold that, under the statute, for purposes of title, such warehouse receipts are as negotiable as promissory notes or bills of exchange; giving to the holder, under all ordinary circumstances, imperative presumption of title and power of disposal; that a principal voluntarily suffering them to be in the hands of a factor, holds out the factor as owner, with unlimited authority to dispose of them; and that the factor may bind his principal, contrary to his instructions, by pledge of them, exactly as at the common law he might bind his principal by pledge of securities negotiable at common law. So the statute expressly provides.

This question was not in *Rice v. Cutler*, 17 Wis., 351, though that case turned upon the construction, in another aspect, of the Warehouse Receipt Act of 1860, before it was amended in 1863, and probably suggested the amendment. But the late Mr. Justice PAINE appears to have taken the same view of it that we now hold. He says: " The provisions of sec. 6 seem to have been designed to accomplish substantially the same purpose as the English Factors' Act, referred to in Abbott on Shipping, 542; 1 Smith's Leading Cases, 885. This object was to protect those dealing with persons entrusted with the usual evidences of title, though in fact being mere agents with special authority. It grew out of inconveniences supposed to result from the rule of law that a factor authorized to sell could not pledge the property of his principal. The section under consideration provides that these receipts, etc., ' may be transferred by the indorsement thereof, and any person to whom the same may be so transferred shall be deemed and taken to be the owner of the goods, wares and merchandise therein specified, *so far as to give validity to any pledge, lien or transfer made or created by such person or persons.*' This language seems unmistakably to indicate that the legislature had in mind the same evil that caused the English

Factors' Act." This is indeed no more than a *dictum*, like the language of the chief justice in *Hale v. Dock Co.*, not neces- sary to the judgment of the court. We cannot but think it unfortunate, however, that it was not within the attention of the chief justice when writing the second portion of his opin- ion in the latter case.

II. Sec. 3 of the Factors' Act, ch. 91 of 1863,[1] so far as we have concern with it here, provides that a factor entrusted with the possession of bills of lading, custom-house permits, or warehouse-keeper's receipts for merchandise, and a factor not having documentary evidence of title, who is entrusted with the possession of merchandise for the purpose of sale or as security for advances to be made, shall be deemed to be the true owner thereof, so far as to give validity to contracts for sale, or disposition of such merchandise for money, etc., advanced upon the faith thereof.

It was urged at the bar that a pledge could not be upheld by both statutes. We do not see why. Both are partly *in pari materia;* and, so far as pledge of warehouse receipts and the like is concerned, produce the same result. There is no conflict, but perfect harmony, between the two provisions. Under the Warehouse Receipt Act, the title passes by deliv- ery; to a factor, clothed indeed with a trust towards his princi- pal. Under the Factors' Act, a factor is to be so far deemed the true owner. Under the Warehouse Receipt Act, the holder

---

[1] The section reads as follows: " Every factor or other agent entrusted with the possession of any bill of lading, custom-house permit or warehouse-keep- er's receipt, for the delivery of any such merchandise, and every such factor or agent not having the documentary evidence of title, who shall be entrusted with the possession of any merchandise for the purpose of sale or as security for any advances to be made or obtained thereon, shall be deemed to be the true owner thereof, so far as to give validity to any contract made by such agent with any other person, for the sale or disposition of the whole or any part of such merchandise, for any money advanced or negotiable instrument or other obligation in writing given by such other person upon the faith thereof."

takes title by delivery.   If the holder be a factor, the statute expressly declares the power which he would take at the common law, to bind his principal by pledge of negotiable paper. And the power of a factor to bind his principal by pledge, which would have followed by the common law upon the Warehouse Receipt Act, is expressly given by the Factors' Act.   So far as the two sections apply here, they appear to be identical in effect.   If there be a distinction, it is too nice for any apparent practical purpose.   Indeed sec. 6 of the Warehouse Receipt Act goes strongly to confirm our construction of sec. 3 of the Factors' Act.   For, so far as it is involved here, the purpose of the two sections appears to be identical.   It may be immaterial, in such a case as this, whether the right of the pledgee is rested on the one statute or on the other, or on both.   It is safer, however, to consider the effect of the kindred provisions upon the pledge.

In New York, from which we took the Factors' Act, it appears to be considered that the term "warehouse-keeper's receipt," following the term, "custom-house permit," applies only to custom-house or bonded warehouses, and not to private warehouses.   Here, where we have no custom-house or bonded warehouses, and where a large proportion of the commerce of the state passes through private or *quasi* private warehouses, whose receipts for merchandise universally pass from hand to hand, in the course of trade, as representatives of the merchandise, and are the subject in the aggregate of enormous transactions, such a limitation of the term is inadmissible. Whatever the legislature of New York may have intended, the legislature here must have intended such warehouses and warehouse-keeper's receipts in use here, as could alone be the practical subject of legislation.

It will be noticed that sec. 3 of the Factors' Act applies to possession by factors of documents of title, apparently without qualification; while it applies to possession of merchandise without documentary evidence of title, when the factor is en-

trusted with the possession for the purpose of sale or as security for advances to be made. It is true that some of the New York cases cited *infra* appear to suggest that the qualification applies equally to the possession of documentary evidences of title, and to possession of merchandise without documentary evidences of title. A careful examination of the section leads us to think this a forced and unwarranted construction, doing violence to the structure and language of the section. As observed in one of the New York cases, the merchandise mentioned in each branch of the section is different; so the factors differently entrusted are distinguished. The first branch speaks of a factor entrusted. The second repeats the word factor, and relates to a factor who shall be entrusted for the purpose, etc. The purpose is not expressed in the first branch of the section; seems too remote in the second branch to relate back to the first; and appears to be effectually severed and excluded from it, by the change in the structure of the language, the repetition of the noun, and the use of the relative pronoun, relating back only to the last use of the noun: a factor who shall be entrusted for a purpose, as distinguished from the factor entrusted generally of the previous branch of the provision. And we are confirmed in this view by the fact that sec. 6 of the Warehouse Receipt Act and the Factors' Act were, in effect, contemporaneously adopted. By the former, the mere delivery by a principal to a factor operates to vest the factor with an apparent legal title, as of a promissory note or bill of exchange payable to bearer. And we cannot believe that the latter was intended to limit this apparent title, by the purpose for which it is created. We are not to overlook here, what should be in mind in every process of construction of this provision, the evil which it aims to cure: the danger occurring from the common-law distinction between the apparent and the real power of a factor by the confidence of his principal.

But perhaps the qualification is insignificant, and cannot

materially affect the construction of either branch of the section. For at common law, the possession of a factor generally imports power to sell, implied in the section by the use of the word factor. And if a factor be entrusted with possession for the purpose of pledge, his power to do so is express, and needs no support from any general rule of the common law or of the statute.

Be that as it may, we shall lay out of view any effect of the qualification. And all that we propose to say of the section will be understood as relating only to the power of factors entrusted with negotiable documents of title.

If the construction of the section, so far, were altogether an original question, we should have little difficulty in holding that, like the section of the Warehouse Receipt Act already considered, it is effectual in its way to obviate the difficulties arising at the common law. Any different construction appears to us to be against the letter of the section and its spirit, forced and unwarrantable. But a difficulty arises in the construction, for the reason that we took the statute from New York, where it was passed in 1830, and where it is claimed that it had received construction before it was adopted here.

The section was before the supreme court of that state in 1844, in *Stevens v. Wilson*, 6 Hill, 512, upon a factor's pledge of merchandise without documentary evidence of title. The late Mr. Justice BRONSON, who delivered the opinion of the court, says of the section, somewhat broadly, that it means only that where the possession of a factor is such as to clothe him with apparent absolute title, the pledge shall bind the principal. This, in effect, was the common law; and if the language be taken as broadly as used, it tends practically to avoid the statutory provisions and relegate the validity of a pledge to the rules of the common law.

The opinion admits that the construction given does violence to the grammatical sense of the section. But it insists that, " it is impossible to suppose that the legislature intended!

to enable the factor to commit a fraud upon his principal, by pledging or obtaining advances upon the goods for his own purposes, when the pledgee or person making the advances knew that he was not dealing with the true owner." With profound deference to that great jurist, that is just what the common law refused to do; just what the statute expressly undertakes to do, by declaring that the factor entrusted by his principal shall be deemed the true owner to give validity to a pledge. The statute was not intended to license or countenance fraud of the factor upon either principal or pledgee. But it was intended for the safety of commercial transactions, to bind the principal by the fraud of the factor, rather than the pledgee whom the confidence of the principal might otherwise enable the factor to overreach. Under the statute, a principal who entrusts his factor, entrusts him with this very power, and entrusts him at his peril of it. Of two innocent parties, the principal and the pledgee, the statute designs that the principal shall suffer by the fraud of his factor. Of course if the pledgee be privy to the fraud of the factor, he takes no title against the principal. "Covin doth suffocate right." But one dealing *bona fide* with a factor, though knowing him to be a factor, may deal with him under the statute as the true owner. Wisely or unwisely, that is the statute as it is written.

The opinion concludes the review of the section thus: "It is said that this construction will make a great inroad upon the usual course of mercantile transactions, and that hereafter no one can safely deal with a factor or a commission merchant. Men may safely purchase from a factor knowing him to be such, for the reason that a sale is within the general scope of his authority. But he has no power to barter, pledge or create a lien upon the goods of his principal; and persons who deal with a factor for any of these purposes, with a knowledge of the character in which he acts, can acquire no rights as against the real owner. If it is desirable in any case that the factor

should have the right to pledge as well as to sell the goods, such a power can easily be conferred by the principal. And it may better be left to a conventional arrangement in each particular case, than to give the factor a legal right in all cases to exercise an unlimited control over the goods of his principal." This, as far as it goes, is an accurate statement of the common law, wholly ignoring the statute, its purpose and letter, and as effectually nullifying its provisions as repeal could do.

The judgment of the supreme court was affirmed by the court of errors in 1846. *Stevens v. Wilson*, 3 Denio, 472. We do not think it necessary to review the opinions given in support of the judgment, which substantially follow the views of Mr. Justice BRONSON. In both courts it was held that the words, *on faith thereof*, in the section, mean on faith of the title of the factor, and not on faith of the thing pledged. This is admitted to do violence to the language used. To us it seems to nullify the provision that the factor shall be deemed the true owner, to give validity to the pledge; substituting the faith of the party for the title of the statute; and appearing to involve the absurdity that a pledgee makes his advance, not at all on the faith of the thing bodily pledged, but altogether on faith of the title to it. Doubtless a pledgee's faith in the pledgor's title enters into every pledge; just as a vendee's faith in the vendor's title enters into every sale. But value is given in both cases for the thing, not for the title. The section authorizes the pledgee to presume the factor's title and authority, without inquiry; just as the common law authorizes the pledgee to presume the factor's title and authority to pledge other negotiable paper. Of course if the factor violate the trust of his principal to the knowledge of the pledgee, the fraud will avoid a pledge as it would a sale. But to rest the validity of the pledge upon the pledgee's faith in the factor's title, is simply to abandon the statute for the common law.

Some stress is laid, in the cases in New York, on the provision of sec. 7 for the punishment of a factor pledging his principal's goods, in fraud of his principal. It is said that the statute cannot be presumed to license what it punishes. The impression which the section produces on our mind is different. To us it seems that it is because the factor takes the power under the statute, that he is punished for abuse of it. If the statute had invested the factor with no such power, it would be less likely to punish an attempt at ineffectual fraud upon the principal; and more likely to punish the factor's effectual fraud on the pledgee. This is the more manifest in the view, that the section equally punishes the factor for fraudulent sale and for fraudulent pledge; the one effectual at the common law, and the other effectual under the statute, to bind the principal, in favor of one dealing *bona fide* with the factor.

It is held in the New York cases that, though sec. 3 does not express, yet it implies, that notice to a pledgee of the title of the principal will defeat the pledge of a factor. Nothing in the section appears to us to imply such an intention on the part of the legislature, or to warrant such an interpolation by judicial construction. As already seen, such a qualification would go far towards nullifying the whole section. And so the language used appears to repel, not imply, such a qualification. The intention of the legislature not so to qualify the power of a factor, under sec. 3, is made quite apparent by a comparison of that with the two preceding sections. Sec. 1 declares that a consignor of merchandise shall be deemed the true owner so far as to give a lien to the consignee, for advances to the consignor. Sec. 2 provides that notice that the consignor is not the actual owner shall defeat the lien of the consignee. *Expressio unius, exclusio alterius.* It is inconceivable that, having devoted sec. 2 to defeat a consignee's lien, upon notice that the consignor is an agent only, the legislature should have left the like effect of notice to implication

in sec. 3, if it had intended that notice of the principal's title should defeat the pledge of a factor.

This view is also strongly supported by the provision of sec. 4, that a factor's pledge for his antecedent debt shall not bind the principal beyond the lien of the factor. This was the common law in all cases, and would be wholly unnecessary in the statute, if the previous section had not given general validity to a factor's pledge, as factor. This is an express saving of the principal's right against the power given to a factor, where a pledgee parts with no value, but only secures an existing demand against the factor. In that case, the greater equity is with the principal, and the statute protects it. On the same principle, the words, *so far as to give validity*, in both statutes, are manifestly used, not to qualify a factor's power to pledge, but to save the principal's right as against the apparent title of the factor himself.

So far, we have considered the section as relating to pledge only; but it applies in terms equally to sale and to pledge. And if the construction of *Stevens v. Wilson* be correct, the statute not only fails to aid the validity of pledges, but materially impairs the validity of sales, by factors. For the statute puts sale and pledge upon the same condition. And if, under the statute, the validity of a factor's pledge rests on the pledgee's faith that the factor is the true owner, so does the validity of a factor's sale rest equally on the same faith. This seems to have been overlooked in *Stevens v. Wilson*, and is inconsistent with things said in all the opinions, in both courts, in favor of the construction given. But it is none the less certain that the statute applies expressly and equally to sale and to pledge; in the view of *Stevens v. Wilson*, putting sales on the same ground as pledges at common law; in our view, putting pledges on the same ground as sales at common law. This alone would appear conclusive of the true construction of the section. In view of the whole history of the question and of the difficulties out of which the question arose, it ap-

pears to us inconceivable that the statute should have intended that the validity of sales, as well as of pledges, should rest upon the good faith of factors to their principals. Such a construction would make it wholly unsafe, in ordinary circumstances, to deal with a known factor for any purpose, and would greatly exaggerate, instead of mitigate, the inconveniences of the common law applying to the course of trade in such matters. But the plain intent of the statute was to obviate those inconveniences, by putting pledges of factors on the same ground as sales of factors at the common law.

It must not be forgotten, however, that *Stevens v. Wilson* went upon a factor's pledge of merchandise, without paper evidence of title; and did not involve the power of a factor to pledge such paper evidences themselves. We took the Warehouse Receipt Act of 1860, also, from New York, but it appears not to have been adopted there until 1858, long after *Stevens v. Wilson.* And therefore, although the general rule undoubtedly is, that we take the construction of a statute with the statute itself, yet the rule would not hold us to accept that case as binding authority upon pledges of instruments of title, negotiable by statute here, not there, even if expressly applicable to them. Indeed it might be a question, whether, in taking a statute, modifying the common law, from a sister state, we necessarily adopt a judicial construction nullifying the provisions of the statute and relegating the subject matter to the common law. We could hardly be said to adopt a judicial repeal of a statute with the statute itself. It seems that some discretion here, in such a case, might be necessary.

In *Covell v. Hill,* 6 N. Y., 374, it is said that there does not appear to be any reason to dissent from the construction given to the section in *Stevens v. Wilson:* a cold expression of affirmance. But in *Cartwright v. Wilmerding,* 24 N. Y., 521, adjudged in 1862, just before the adoption of the Factors' Act here, a different view of the statute seems to be taken. *Stevens v. Wilson* appears to be cited to the single point of the

effect of notice of the principal's title. The general view of the statute taken in *Stevens v. Wilson* is not expressly affirmed or overruled. But the doctrine in the two cases appears to be, in many respects, irreconcilable. GOULD, J., in delivering the opinion of the court, after commenting on the English statute, says:

" Our statute departed entirely from the common law, and, by making a factor's possession such evidence of ownership as to enable him to do all acts which the true owner might, manifested a totally different intent from that of the English act. Substantially, it left an owner to use his precautions when he selected his factor; thereafter leaving him to be responsible for the acts of his agent, and protecting a *bona fide* third person in any transaction fairly effected with the apparent owner. And, for the benefit of trade, the statute said that the delays incident to following up the line of title, and the extent of authority, might be dispensed with, except so far as the statute itself retained them; that is, as to bailees receiving goods for carriage."

This view of the statute is wholly different from that taken in *Stevens v. Wilson;* appearing to agree, rather, with our view of it. And although we cannot assent to all that is said in *Cartwright v. Wilmerding*, yet that case, taken with *Stevens v. Wilson*, relieves us from embarrassment here, by showing that when we took the statute from New York, there was no settled or uniform construction of it there. This court is, therefore, free to put its own construction on the section. And we need only add that the judgment in *Cartwright v. Wilmerding*, where the pledge was of an instrument of title, is quite in accord with our construction of the statute.

There seems to have been some lamentation over the morality of such a construction of the statute, which is apparently superfluous. The statute only enlarges the general power of a factor. At the common law, a factor takes general power to sell. By the statute, a factor takes general power to pledge.

At the common law, a factor may bind his principal by sale in violation of his instructions. Under the statute, a factor may bind his principal by pledge in violation of his instructions. The statute enlarges the risk of a principal on the good faith of his factor; but the less risk at the common law, and the greater risk under the statute, rest on the same principle. At the common law and under the statute alike, a principal voluntarily employs a factor at his peril of the general power of the factor. In either case, the risk is defined and voluntary. And the morality of the statute is identical with the morality of the common law.

III. Under both statutes, we hold these rules applicable, under ordinary circumstances, to the possession of a factor:

1st. A principal entrusting his factor with power to purchase and retain a negotiable warehouse receipt, suffers the apparent legal title of the receipt to be in the factor, clothed with a trust towards himself.

2d. A principal transferring the possession of a negotiable warehouse receipt to a factor, passes the apparent legal title of the receipt to the factor, clothed with a trust towards himself.

3d. In either case, a principal entrusts his factor with the power to pledge, as well as to sell, in favor of one dealing in good faith with the factor.

4th. Notice that the holder of a negotiable warehouse receipt holds it as a factor, is not notice of any limit of the factor's power of disposition by sale or pledge, as between the factor and his principal.

5th. A factor's sale or pledge of a negotiable warehouse receipt, in violation of his instructions, will not bind his principal, if the vendee or pledgee has notice that the factor holds his title for a principal, and sells or pledges in violation of the principal's instructions.

It is, of course, needless to point out how the charge of the learned judge of the court below differed from our views of

the rules governing this case. The verdict of the jury, as first given, found that the appellant had notice that the factor was not the owner of the warehouse receipt in his own right, at the time of the pledge, but acted in good faith in the transaction. The learned judge of the court below held these findings to be inconsistent, and instructed the jury in effect that the appellant could not have acted in good faith with such notice. In our construction of the law, the verdict may have been right, and the view of it taken by the learned judge was certainly wrong. The jury thereupon changed the verdict, so as to find that the appellant did not act in good faith. The modified verdict, under the charge, cannot stand.

*By the Court.* — The judgment is reversed, and the cause remanded to the court below for a new trial.