## C. W. TURNER v. CRUMPTON & CRUMPTON.

(130 N. W. 937.)

**Factors and Brokers — Employment — Evidence — Words and Phrases.**

The evidence examined and held to show that the employment of the defendants by the plaintiff was under a contract authorizing them to act as factors for the plaintiff, and not as plaintiff's brokers. Hence defendants had the right to purchase grain in their own names and ship the same to plaintiff, retaining title in themselves as security for their advances to plaintiff.

Opinion filed March 14, 1911.

Appeal from Nelson county court; *Templeton, J.*

Action by C. W. Turner against Crumpton & Crumpton. From the judgment, defendants appeal.

Reversed and remanded.

*Frich & Kelly,* for appellants.

If "A" employs "B" to go into the market and "get" an article and send it to him, and "B" does so, pays for it and the freight, he is entitled to recover from "A" the money advanced and reasonable compensation. Green v. Feil, 41 Wis. 620; Clifton v. Ross, 60 Ark. 97, 28 S. W. 1085; Brown v. Clayton, 12 Ga. 564; Dow v. Worthen, 37 Vt. 108; Bartlett v. Smith, 4 McCrary, 388, 13 Fed. 263; Thompson Bros. v. Cummings, 68 Ga. 124; Wyeth v. Walzl, 43 Md. 426; Field v. Banker, 9 Bosw. 467; Finlay v. Stewart, 56 Pa. 183; Bibb v. Allen, 149 U. S. 481, 37 L. ed. 819, 13 Sup. Ct. Rep. 950; Ruffner v. Hewitt, 7 W. Va. 585; Hoy v. Reade, 1 Sweeny, 626; Wiger v. Carr, 131 Iowa, 584, 11 L.R.A.(N.S.) 650, 111 N. W. 657, 11 A. & E. Ann. Cas. 998, and cases; 31 Cyc. Law & Proc. p. 1532.

Defendants' lien on the goods warranted their preventing delivery. Tiedeman, Sales, § 126, and cases cited; 31 Cyc. Law & Proc. p. 1545.

Defendants could assert their lien, or waive it and enforce their personal remedy against plaintiff. Burrill v. Phillips, 1 Gall. 360; Fed. Cas. No. 2,200; Peisch v. Dickson, 1 Mason, 9; Fed. Cas. No. 10,911; Martin v. Pope, 6 Ala. 532, 41 Am. Dec. 66; Beckwith v. Sibley, 11 Pick. 482; Dolan v. Thompson, 126 Mass. 183; Zoit v. Millaudon, 4 Mart. N. S. 470; De Bavier v. Funke, 50 N. Y. S. R. 442, 21 N. Y. Supp. 410, affirmed in 142 N. Y. 633, 37 N. E. 566; Willingham v. Rushing, 105 Ga. 72, 31 S. E. 130; Rosenbaum v. Hayes, 8 N. D. 461, 79 N. W. 987.

*John J. Samson* and *Skulason & Burtness,* for respondents.

The case is controlled by Robbins v. Maher, 14 N. D. 228, 103 N. W. 755.

Goss, J. The plaintiff, a resident of Warwick, this state, at various times between the 1st of September, 1906, and the 22d of May, 1907, shipped to the defendants, who were commission men of Duluth, Minnesota, grain aggregating over forty carloads, to be sold by the defendants for him; and on August 24, 1908, the defendants were indebted to plaintiff, as a balance on said transactions, in the sum of $325.67, to recover which plaintiff began this action. The defendants admit their

indebtedness to the plaintiff in said amount because of said transactions, but by way of defense counterclaim in the sum of $599.93 for loss claimed to have been sustained by them upon a shipment by them to plaintiff in April, 1907, of 2,000 bushels of corn, which was refused by plaintiff and then resold by them at a loss in said amount. The counterclaim was denied; plaintiff alleging that the corn on arrival at Warwick had been damaged because of carelessness of the defendants and that the transaction was thereupon rescinded.

The corn was ordered by letter. The correspondence between the parties constitutes the contract and consists of the letters herein set forth in full.

A letter of plaintiff addressed to defendants at Duluth, Minnesota, under date of March 7, 1907, reading:

"I would like to have you send me a car of corn and don't know whether you can get it there or not, or if it would be cheaper in Minneapolis, and as there is no agent here, I don't know when the seed rate starts, as I don't want it shipped until I can get seed rates. Wish you would look this up, and if the seed rate is on, send me a car of 1,000 bu. to Warwick. Please let me know what you can do on this matter and oblige."

To this letter defendants replied from Duluth, Minnesota, under date of March 11, 1907, addressed to plaintiff, as follows:

"You spoke about wanting a car of corn, but we will have to look into the matter first, and will report to you what we can do regarding it, and you can then notify us when to ship the same."

On April 5th following, the plaintiff wrote defendants in substance the following:

"I have been waiting to hear from you about that car of corn I ordered sometime ago, but have not heard anything. I have sold about 2,000 bu. and I wish you would send me another car as soon as possible; and, if you have not sent me any yet, send two cars, as I have it sold, and the farmers want to get it right away. I am going to buy some flax for a while and I want the corn to sell at the same time. Please let me hear from you."

To which defendants replied under date of April 8, 1907, from Duluth, Minnesota, addressed to plaintiff:

"Yours of the 5th received, asking us to order two cars of corn

shipped you at Warwick, which we have done, instructing our office at Minneapolis to ship you two 1,000 bu. cars of corn as directed, and as soon as we get word from them will inform you what they had got for you, and very likely it will be at your place in the near future."

And immediately thereafter defendants had their Minneapolis office, in defendant's firm name, buy 2,000 bushels of corn and ship the same in two cars to plaintiff, at Warwick. The corn was bought in Minneapolis because it could not be purchased in Duluth.

On April 11, 1907, defendants wrote plaintiff as follows:

"We have received word from our Minneapolis office that they purchased two cars of yellow No. 4 corn at 38 cents f. o. b. mpls. and that about 1,000 bu. will be loaded in each car and billed you at Warwick. as directed. This corn was bought at one cent less than No. 3 yellow, and it is good yellow corn, fairly sound, and will keep just as well as the No. 3 corn. We trust there will be no delay in transit and that you will be satisfied with the purchase."

The foregoing letters were received in due course of mail by the respective parties to whom they were addressd.

When the corn arrived it was unfit for seed; it having germinated, heated, and spoiled in transit. Plaintiff refused to accept it, whereupon defendants ordered it returned, and pursuant to the custom of the Minneapolis market resold the same at that place in the open market, charging plaintiff's account with the loss, leaving him indebted thereby to defendants in the sum of $276, for which defendants demand judgment of plaintiff on their counterclaim.

It is noticeable that the contract of employment to make the purchase of this grain was not dealing in futures, but instead contemplated the actual purchase and delivery of corn already resold for seed purposes by the defendant pending its arrival. The transaction, then, is in nowise a gambling transaction; it was an order from a purchaser to this commission firm, directing them to procure immediately the corn at Duluth or Minneapolis, wherever cheapest, with explicit instruction for immediate shipment to such purchaser. The order was complied with to the letter, and immediately full information of the purchase, including quantity, price, and shipment, was communicated to the purchaser. Had the defendants owned the corn when the order was received, and filled the order by immediate shipment to the plaintiff, it

would have been an ordinary purchase and sale. But plaintiff was in the elevator business, and the order was given to the commission firm usually used by him as his selling agent of grain purchased in the course of his business, and shipped to them to sell for him. Instead of the usual sale, this order was for a purchase, directing his commission men to obtain and send him the corn immediately. Plaintiff testifies that when he gave the order he expected that the defendants would have to go into the open market at Duluth or Minneapolis to get the grain, and that he did not tell them where to buy it, but that he expected it to be inspected out of the elevator where it was purchased. A reasonable construction of the letters would be that defendants should purchase the grain, and from plaintiff's own testimony he so intended they should act. Under the terms of the employment, the commission agents were by necessary implication given authority to purchase in their own names. The order necessarily implied the advancement by them of their credit or money in the procurement of the grain for shipment.

Under this state of facts they bought the corn, paying for it themselves, immediately shipping it to plaintiff, and, instead of accompanying the consignment with the usual bill of lading, charged plaintiff's account therewith. They owed him an open account over $300, as a balance due on previous consignments shipped to them for sale. It was but natural that they should charge his account with this transaction of a similar nature.

In what capacity, then, did defendants act for plaintiff in such purchase? If the transaction is one of brokerage and a matter in which defendants acted in the capacity of brokers for the plaintiff, the action of the trial court in striking all evidence of a counterclaim from the record and advising a verdict for the plaintiff was proper, under Robbins v. Maher, 14 N. D. 228, 103 N. W. 755, and all authorities. In fact, the record discloses that the learned trial judge based his ruling upon the above holding. Defendants, however, contend that they acted for plaintiff as factors for him. If so, they had the right to purchase in their own names, and can urge their counterclaim for damages based on defendants' refusal to accept the grain so purchased for him.

"The true definition of a broker seems to be that he is an agent employed to make bargains and contracts between other persons in matters of trade, commerce, or navigation for a compensation commonly called

brokerage. **Or, to** use the brief but expressive language of an eminent judge, 'a broker is one who makes a bargain for another and receives a commission for so doing.' Properly speaking, a broker is a mere negotiator between the other parties, and he never acts in his own name but in the names of those who employ him. Where he is employed to buy or to sell goods, he is not intrusted with the custody or possession of them, and is not authorized to buy or to sell them in his own name. He is strictly, therefore, a middleman or intermediate negotiator between the parties." Story, Agency, § 28. Again, a broker is defined as "one whose occupation it is to bring parties together to bargain, or to bargain for them, in matters of trade, commerce, or navigation; he is essentially a middleman or go-between." Mechem, Agency, § 13. "He [a broker] differs from a factor also, in that he does not ordinarily have the possession of the property which he may be employed to sell, and that his contracts are always made in the name of his employer. As will be seen, he is primarily the agent of the first person who employs him, and he cannot, without the full and free consent of both, be throughout the transaction the agent of both parties." Mechem, Agency, § 927. Again: "Brokers are agents who are engaged to negotiate contracts for other persons relative to property, with the custody of which they have no concern. . . . He is a mere negotiator between the other parties. It is the duty of a broker to bring the contracting parties together for the purpose of making a contract, or he may, if so authorized, make the contract for them. . . . Merchandise brokers are those who negotiate the sale of merchandise without having the possession or control of it as factors have." Reinhard, Agency, § 21. "The features which mainly distinguish a factor from a broker are: The former is intrusted with the possession, disposal, and control of the property, and may sell it in his own name and bind the principal; . . . the broker is, strictly speaking, a middleman or intermediate negotiator between the parties, and is not in the fiduciary relation of an agent to his principal, but must favor neither the one nor the other of the parties between whom he effects a transaction." 19 Cyc. Law & Proc. p. 116.

The foregoing definitions are but illustrative of every definition of the term "broker," which term is not defined by our statute.

A "factor" is defined by our statute as follows (Rev. Codes 1905):

Section 5801: "A factor is an agent who is employed to buy or sell property in his own name, and who is instrusted by his principal with the possession thereof, as defined in § 5582."

· "Section 5582. A factor is an agent who, in the pursuit of an independent calling, is employed by another to sell property for him, and is vested by the latter with the possession or control of the property, or authorized to receive payment therefor from the purchaser."

It will be noticed the two sections together as quoted constitute the statutory definition of factor, and that a factor may buy as well as sell property the subject of the agency. But, in the absence of a statute as broad as ours declaring that a factor may buy as well as sell property, the courts have held the term "factor" to apply to a purchasing agent, as well as to one employed to sell property. Price v. Wisconsin M. & F. Ins. Co. 43 Wis. 267, in an opinion by Chief Justice Ryan, to the effect that "a factor is an agent to buy or to sell." A factor may buy and sell in his own name as well as in the name of his principal; a factor buying goods for his principal in his own name is personally liable for the price. Story, Agency, § 110. To the same effect is McGraft. v. Rugee, 60 Wis. 406, 50 Am. Rep. 378, 19 N. W. 530, and Beardsley v. Schmidt, 120 Wis. 405, 102 Am. St. Rep. 991, 98 N. W. 235.

Under the testimony, it conclusively appears that the statutory definition of "factor" covers the relation existing between the parties, and that being the nature of the agency, the brokerage case of Robins v. Maher, upon which the court based its decision, does not control the decision of this action. The commission men had the right to purchase this grain and retain the title until paid for, under the authority necessarily implied granted the defendants by the letters of plaintiff. "Where an agent purchases goods intended for his principal, but, according to the express or implied agreement of the parties, buys them upon his own credit, or with funds furnished by himself, he may retain the title to the goods until they are paid for by the principal." Mechem, Agency, § 689; Farmers' & M. Nat. Bank v. Logan, 74 N. Y. 568; Farmers' & M. Nat. Bank v. Atkinson, 74 N. Y. 587; First Nat. Bank. v. Shaw, 61 N. Y. 283; Moors v. Kidder, 106 N. Y. 32, 12 N. E. 818.

In Moors v. Kidder above cited, in the opinion of the court we find

the following statement: "The doctrine stated was in substance [referring to Farmers' & M. Nat. Bank v. Logan] that where a commercial correspondent, however, set in motion by a principal for whom he acts, advances his own money or credit for the purchase of property, and takes the bill of lading in his own name, looking to such property as the reliable and safe means of reimbursement up to the moment when the original principal shall pay the purchase price, he becomes the owner of the property instead of its pledgee, and his relation to the original mover in the transaction is that of an owner under a contract to sell and deliver when the purchase price is paid." The defendants stood in the relation of vendors to plaintiff vendee in this transaction.

Under the evidence and the foregoing authorities, we are constrained to hold that the defendants in the transaction in question were the factors of the plaintiff, and as such they were authorized to construe the letters as a direction to purchase as a necessary incident to the procurement of the grain to be sent plaintiff. But granting for the sake of argument that the letters are ambiguous as to defendants' authority so to act, the defendants have acted in good faith under the construction that they should purchase in their own names, and ship, and thereby act as factors of the plaintiff, and he is bound by their reasonable construction of the order to that effect. They had in previous dealings acted as factors in selling grain, and if plaintiff did not intend they should act in such capacity, and should so construe his order, his directions should have been unambiguous in this particular. "The instructions given by a principal to his factor must be clear and distinct and express, and not a mere communication of an expectation or belief as to the result of a transaction; and if they are so ambiguous that they are capable of more than one construction, and the factor, in good faith, acts according to one, he cannot be held liable if loss ensue, because the principal intended that he should act according to the other." 2 Clark & S. Agency, page 1789 and cases cited.

For the foregoing reasons, the judgment ordered must be reversed. Defendants in the trial court made a motion for judgment notwithstanding the verdict. But plaintiff has interposed a reply to the counterclaim. The trial court held against the validity of the counterclaim, and struck out the evidence tending to establish it. This rendered it unnecessary for plaintiff to offer any testimony under his reply to the counterclaim.

Hence no such evidence was offered or received, and it appears that if the case be retried one issue for determination may be that tendered by the counterclaim and reply thereto. On a retrial, then, the parties may try this issue, and may offer more and other proof than that now before the court. Under this state of the record, following Meehan v. Great Northern R. Co. 13 N. D. 432, 101 N. W. 183, it is our duty to deny the motion for judgment notwithstanding the verdict, and remand the case for retrial. It is so ordered.

All concur, except Morgan, Ch. J., not participating.