WILLIAM D. P. CAREY ET AL., APPELLANTS, V. FRANK E. HUMPHRIES ET AL., APPELLEES.

107 N. W. 2d 20

Filed January 13, 1961. No. 34789.

*Halcomb, O'Brien & Everson,* for appellants.

*Van Steenberg, Myers & Burke* and *Baker & Smart,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

Magnolia Petroleum Company, hereafter called Magnolia, was the owner of oil and gas leases covering the west half of the northwest quarter, the west half of the northeast quarter, and the south 58.13 acres of the east half of the southwest quarter of Section 17, and Lot 3 in Section 20, Township 12 North, Range 56 West of the 6th P. M., Kimball County, Nebraska, together with other lands not involved in this litigation. Magnolia proposed in writing to Dan Reinfried, designated herein Reinfried, that if he would commence on or before a stated date the drilling of an oil well to be located at a described location on Lot 3; would prosecute the drilling of the well with due diligence to a depth sufficient to test to the satisfaction of Magnolia the Skull Creek shale at an estimated depth of 6,700 feet unless oil or gas was produced in paying quantities at a lesser distance; would fully comply with all other provisions of the writing; and would complete the well within a reasonable time not later than 60 days from the date of the commencement of it, Magnolia would assign to Reinfried the described oil and gas leases to the extent and insofar as they covered the above specifically described land of about 240 acres more or less. The writing containing the offer of Magnolia to Reinfried stated it was not binding upon Magnolia until it was accepted by Reinfried as it was submitted to him as evidenced by

his signature subscribed thereon and its return to Magnolia within 15 days from the date of the writing; and upon Reinfried's signing and returning it and three copies thereof within that time, the writing would constitute a valid and binding contract between Reinfried and Magnolia. Reinfried signed the writing under the words endorsed thereon: "ACCEPTED in all its terms and conditions, this 28 day of January, 1958." The offer made by Magnolia to Reinfried as stated above was subject to other definitely stated conditions and obligations not necessary to be recited herein because none of them are involved in this litigation.

Later Sinclair Oil & Gas Company, designated hereafter as Sinclair, offered Reinfried by an instrument designated "Acreage Contribution Agreement. Our Lease No. 132 Kimball County, Nebraska" that if he commenced operations for the drilling of a well for oil and gas on or before a date stated upon a described location identical with the one designated by Magnolia and drilled it with due diligence to a depth sufficient to test the top of the Skull Creek formation anticipated in this vicinity at approximately 6,650 feet, then, upon being furnished by Reinfried with evidence satisfactory to Sinclair that such test well had been so commenced, drilled, and finally completed either as a producing well or plugged and abandoned as a dry hole on or before May 15, 1958, Sinclair would assign to Reinfried all its right, title, and interest in and to the east half of the southeast quarter of Section 17, Township 12 North, Range 56 West of the 6th P. M., in Kimball County, Nebraska. The offer of Sinclair to Reinfried as above recited was made subject to compliance by the latter with definitely stated conditions not necessary to be set forth herein because none of them are involved in this litigation. The instrument containing the offer of Sinclair to Reinfried provided it should not be binding on Sinclair unless its acceptance by Reinfried was noted on the instrument and it was returned to Sinclair within

15 days from its date. It was accepted and agreed to in writing, endorsed thereon, and signed by Reinfried on the fourth day after its date.

Shell Oil Company, identified herein as Shell, on the date Reinfried accepted the offer of Sinclair above referred to, offered in a writing designated "Dry Hole Contribution" to contribute $6,500 toward the cost of drilling a test well by payment thereof directly to Braden provided the drilling of the well was completed as a dry hole, the test to be commenced not later than a date specified at a described location on Lot 3 and thereafter drilled with due diligence to a depth of 75 feet below the top of the Dakota "J" sandstone or to a depth of 6,760 feet, whichever was first reached. Shell specified its offer was subject to other stated conditions but they are not repeated herein because none of them are involved in this litigation. The writing evidencing the offer of Shell was accepted and acted upon.

The Braden Drilling Company was a partnership. Robert G. Braden, hereafter referred to as Braden, was one of the two members of it. He was an active member of the Kansas Bar; resided and had his office in Wichita, Kansas; and he performed legal services for and participated in the activities of the partnership which maintained an office in Denver, Colorado, in charge of Jerry Slater, hereafter called Slater. Any acreage in the Denver-Julesburg Basin in which the partnership was concerned was held in the name of Braden for its convenience.

A letter was signed and transmitted by Braden to Reinfried in which recitals were made concerning the commitment of Magnolia and Sinclair to assign oil and gas leases to Reinfried and the commitment of Shell to contribute dry-hole money as above stated. The letter of Braden stated that it was to confirm the verbal agreement between him and Reinfried relative to the real estate described in the leases and was in substance as follows: Reinfried agreed to assign the acreage cov-

ered by the leases to Braden and they understood that Reinfried was to receive an overriding royalty equal to 4 percent of seven-eighths working interest in each of the tracts and a cash consideration of $500; that Braden was to receive a full seven-eighths working interest therein burdened only by the overriding royalty of Reinfried; that Braden was to have all the benefits of the dry-hole obligation of Shell as above recited herein, subject to the conditions recited in the agreement concerning it; and that the oil and gas well was to be commenced not later than March 9, 1958. Reinfried was asked by the letter, if it expressed his oral agreement with Braden, to sign and return one copy of the letter and retain the other copy of it. Reinfried attached his signature thereto under the words written on the original of the letter when he received it: "ACCEPTED this 4th day of February, 1958."

The time of the commencement of the oil and gas well was by agreement of the interested parties extended. The drilling equipment was moved to the location of the well not later than April 1, 1958. The drilling of it was finished and it was established as a producing oil well on about April 28, 1958.

There is no claim made in this case that any agreement or obligation of Magnolia, Sinclair, Braden, or Reinfried as hereinbefore recited was not wholly and timely performed and satisfied. Magnolia assigned the oil and gas leases described in its agreement with Reinfried to him as it was obligated thereby to do; likewise Sinclair assigned the oil and gas lease described in its agreement with Reinfried to him as it was obligated thereby to do. Braden paid Reinfried the $500 cash consideration and drilled the well which proved to be an oil-producing one, as his contract with Reinfried obligated Braden to do. Reinfried assigned the oil and gas leases he secured from Magnolia and Sinclair, respectively, to Braden subject to the 4 percent of the seven-eighths overriding royalty retained by Reinfried

as he was obligated to do by the agreement between him and Braden.

The agreement and obligation of Shell concerning the contribution of dry-hole money was wholly annulled and disposed of by the fact that the well drilled by Braden was a producing oil well and was not a dry hole.

Reinfried obtained information in the latter part of June 1958, by happenings hereafter stated, that there was no oil and gas lease covering Lots 1 and 2 of Section 20, Township 12 North, Range 56 West of the 6th P. M., Kimball County, Nebraska. He secured an oil and gas lease covering the land last described from the owner and her husband under date of July 7, 1958. Reinfried was named as the lessee therein and the lease was soon thereafter filed for record and recorded in the office of the register of deeds of Kimball County, Nebraska. The lease covering the last above-described real estate and an amendment and extension of it were filed on July 23, 1958, and were assigned by the lessee to Frank E. Humphries, B. B. Bradish, and Dan Reinfried, subject to an undivided 4 percent of seven-eighths overriding royalty of all oil and gas produced, saved, and marketed from the acreage described in the lease which was reserved and retained by Reinfried. The assignees named in the assignment of the lease were the members of a partnership organized April 1, 1958.

There were about a score of persons and one partnership named as plaintiffs in this case in the trial court. The record is substantially silent concerning all of them except Robert G. Braden mentioned above and Ray O. Braden, the only members of the Braden Drilling Company, a partnership. Any interest of the individual plaintiffs except Robert G. Braden in the subject of this litigation was derived through Robert G. Braden and is identical in character with his interest. The above-described individuals or any of them did not participate in any way in the negotiations or agreements concerning or the performance of the agreements which

resulted in the drilling of the oil well on Lot 3 above described except Ray O. Braden who was the other member of the Braden Drilling Company. There were several defendants named in this case when it was commenced. All of them except Frank E. Humphries, B. B. Bradish, and Dan Reinfried as individuals and as the only members of the partnership Humphries-Bradish-Reinfried were dismissed from the case and it was dismissed with prejudice as to them before the trial of the case was had. Frank E. Humphries, B. B. Bradish, and Dan Reinfried will be designated as appellees except when they are referred by the surname of the one or ones mentioned. The partnership of Humphries-Bradish-Reinfried will be designated by the word partnership. The plaintiffs in the trial court will be designated appellants.

The amended petition of appellants is long and involved. The substance of the parts of it necessary to be stated to show the basis of the claims of appellants for the relief they seek is as follows: That Braden and Reinfried before January 25, 1958, made an agreement for testing an area surrounding Lot 3, Section 20, Township 12 North, Range 56 West of the 6th P. M., Kimball County, Nebraska, afterwards referred to as Lot 3, for oil and gas for their mutual benefit and gain which was reduced to writing on January 25, 1958; that appellants, by their representative Slater, requested Reinfried to ascertain by checking the records of Kimball County, Nebraska, and Weld County, Colorado, or by other means, if there was any acreage available to be leased for oil and gas exploration and development within a 1-mile radius of Lot 3; that Reinfried agreed to take suitable steps before the commencement of the proposed test well to ascertain the facts in that regard; that if any acreage was found to be available for leasing, an effort would be made to secure a lease or leases covering it; that if secured appellants and appellees would share in the oil and gas leasehold estates secured on

the same terms as was provided in that respect in the oil and gas leasehold estates referred to in the agreement made by Reinfried and Braden in relation to drilling a well on Lot 3 as hereinbefore stated; that appellants before the commencement of the test well by Braden inquired on occasions of appellees or some of them if they had ascertained if there was any open acreage or oil and gas leases that could be obtained in the area where the well was to be drilled, and appellees or some of them reported to appellants that the checking had not been completed, but assurances were given that it would be accomplished promptly; that appellees advised appellants before the drilling of the test well on Lot 3 was commenced, the exact date of which appellants cannot state, that there was no acreage not leased for oil and gas within a radius of 1 mile of the location where the drilling was proposed and intended to be done; that appellants relied on what they were told or otherwise they would have made a suitable check for open acreage before the drilling of the well was commenced; that a general custom existed in the oil and gas exploration and development industry whereby any person intending to drill a test well for oil and gas refrained from doing so on land adjoining a tract not leased for oil and gas exploration; that appellants knew and appellees knew or should have known of the custom at the times herein concerned; that appellants would not have commenced the drilling of the test well but for the assurances given them by appellees as aforesaid; that Lots 1 and 2 of Section 20 which were immediately east of Lot 3 of that section were in fact not covered by an oil and gas lease at any time before July 7, 1958, which appellees knew before the undertaking was entered upon in reference to the test well on Lot 3 or during the time that undertaking was being carried out, but they or any of them did not report such fact to appellants or any of them; that Reinfried secured an oil and gas lease on Lots 1 and 2 on or about July

7, 1958, which was recorded in the public records of Kimball County, Nebraska, without the knowledge or acquiescence of or any notice to appellants; that appellees violated their duties and obligations to appellants in the following respects: (1) Appellees failed to inform appellants of facts important to the object of their mutual undertaking of which appellees had knowledge before the commencement thereof or during its prosecution; (2) appellees did not properly investigate and ascertain if there was open, unleased acreage for oil and gas exploration and development within a 1-mile radius of Lot 3 before commencement of the test well or if they did they failed to correctly report the true facts to appellants or any of them; (3) appellees did not advise appellants of the fact that Reinfried had acquired an oil and gas lease on Lots 1 and 2; and (4) appellees have assigned the leasehold estate in Lots 1 and 2 created by the oil and gas lease secured thereon by Reinfried to the extent that it is not available to convey to appellants the interest therein they are entitled to have and enjoy.

The amended petition also states that the great cost of drilling a test well for oil and gas on Lot 3 by appellants resulted in an enhancement of the value of an oil and gas leasehold estate as to Lots 1 and 2 and it would be unjust and inequitable if appellants were denied probable and proximate results of their endeavors; that if appellees were permitted to secure a greater portion of the benefits resulting from the undertaking of appellants and appellees than was originally contemplated, an unjust enrichment of appellees would result therefrom; that justice, fairness, and equity require an adjudication that appellees hold all the title and interest in and to the aforementioned oil and gas leasehold estate in Lots 1 and 2 for the use and benefit of appellants; and that substantial quantities of oil have been removed from Lots 1 and 2 and it constitutes a portion of the leasehold estate involved in this litigation.

Appellants ask the court to declare that appellees and each of them hold the right, title, and interest standing in their respective names with reference to the oil and gas leasehold estate created by the lease of July 7, 1958, and the amendment and extension thereof recorded respectively in book 39, pages 621 to 623, and book 39, pages 624 and 625; and in the oil and gas leasehold estate created by the leases described in the written agreement hereinbefore described made by Magnolia and Reinfried recorded in book 1, page 191, and in book 1, page 193, of the public records of Kimball County, Nebraska, so far as the leases cover the west half of the northwest quarter, the west half of the northeast quarter, and the south 58.13 acres of the east half of the southwest quarter, Section 17, Township 12 North, Range 56 West of the 6th P. M., Kimball County, Nebraska, and Lot 3 in Section 20, Township 12 North, Range 56 West of the 6th P. M., in Kimball County, Nebraska; and in the oil and gas leasehold estate evidenced by the lease recorded in book 10, pages 213 and 214, of the public records of Kimball County, Nebraska, insofar as it covers the east half of the southeast quarter of said Section 17, in trust for appellants in the proportions set forth in the amended petition, and for such other and further relief as may be just and equitable.

The separate answer of Reinfried, the separate answer of Frank E. Humphries and B. B. Bradish, and the separate answer of the partnership each admitted the agreement entered into by Reinfried and Braden in reference to the drilling of a well on Lot 3 as hereinbefore recited; that the members of the partnership on or about April 1, 1958, entered into an agreement providing that they would thereafter conduct an oil and gas business for the benefit of the three of them in the proportion of one-third to each; that Magnolia and Reinfried, and Sinclair and Reinfried, entered into agreements as hereinbefore stated; that Lots 1 and 2 of Section 20

above described were not covered by any oil and gas lease before July 7, 1958; that Reinfried secured in his name an oil and gas lease covering Lots 1 and 2 on or about July 7, 1958; that an amendment and extension of that oil and gas lease were secured by Reinfried on or about July 21, 1958; and that the oil and gas lease and the amendment and extension thereof were assigned by Reinfried to Frank E. Humphries, B. B. Bradish, and Dan Reinfried. Each of the answers denied all of the statements of the amended petition not admitted. The separate answer of Frank E. Humphries and B. B. Bradish and the separate answer of the partnership contained additional allegations as follows: That on or about April 1, 1958, appellees entered into an agreement by the terms of which they agreed to exchange among each other certain interests in oil and gas leases and thereafter to conduct an oil and gas lease business for the benefit of all of them in a proportion of one-third to each; that assignments of interest in oil and gas leases were made in accordance with the agreement and since that date appellees have each equally shared in the oil and gas business conducted by them; that because of the agreement Reinfried assigned to Frank E. Humphries and B. B. Bradish each a one-fourth of 1 percent of seven-eighths overriding royalty in the oil and gas leases covering the west half of the northwest quarter, the west half of the northeast quarter, and the south 58.13 acres of the east half of the southwest quarter of Section 17, and Lot 3 in Section 20, Township 12 North, Range 56 West of the 6th P. M., in Kimball County, Nebraska; and that prior to the acquisition of the oil and gas lease on Lots 1 and 2 and for some time thereafter appellees or any of them did not know nor did they have reason to know that Braden or his agents claimed to have made an alleged agreement with appellees or any of them employing appellees or any of them to check the records of Kimball County, Nebraska, or Weld County, Colorado, to ascertain if there were any oil and

gas leases available and to ascertain if there was acreage not covered by oil and gas leases within a 1-mile radius of Lot 3. The separate answer of Frank E. Humphries and B. B. Bradish alleged that they were each bona fide purchasers for value of all interest in the oil and gas leases transferred to them by Reinfried and that they and each of them were without notice of any claims of any kind of Braden or his assigns at the time of the acquisition of such interests in the oil and gas leases by B. B. Bradish and Frank E. Humphries.

The reply of appellants to the answers of appellees was a denial of the statements therein inconsistent with the amended petition and an assertion that any interest Reinfried had on or about April 1, 1958, in the west half of the northwest quarter, the west half of the northeast quarter, and the south 58.13 acres of the east half of the southwest quarter of Section 17 was acquired by his participation in the joint venture referred to in the amended petition.

The district court found at the conclusion of the trial of this case generally for appellees and against appellants; that the agreement made by Reinfried and Braden concerning the drilling of a well on Lot 3, appearing in evidence as exhibit No. 1, did not create the relation of principal and broker, principal and agent, or joint adventurers; that there was not at any time any confidential relationship between Reinfried and the plaintiffs (appellants) or any of them or between the other defendants (appellees) and plaintiffs or any of them; that the evidence is insufficient to show any custom creating duties and obligations between Reinfried and plaintiffs or any of them or between the other defendants and the plaintiffs or any of them known to said parties; and that no constructive trust should be imposed upon the defendants' interests in the oil and gas leasehold estates described in the prayer of the plaintiffs' amended petition. A judgment of dismissal of the action was rendered. A motion for a new trial was

denied and this appeal is from that order.

Appellants say that the relationship of Reinfried and appellants in carrying out the project poses the major question. This is equivalent of saying the relationship of Reinfried and Braden in entering into a contract for the drilling of the well on Lot 3, completing it as a producing well, and fully consummating the contract is decisive of this case because none of the other appellants had any negotiations or contract with Reinfried concerning that contract or anything done or accomplished because of it. Any interest or right of those appellants in the subject matter of this case resulted wholly by virtue of what took place between them and Braden to which Reinfried was a total stranger. Appellants characterize the relationship as fiduciary because, as they assert, Reinfried and Braden were thereby engaged in a joint adventure. Braden had no conversation or negotiation with Reinfried concerning the drilling of a well on Lot 3. The negotiations with reference to that were carried on between Reinfried and Slater, an employee of the drilling company who had charge of its Denver office. The first contact of Braden with that transaction was when the letter which later was made the contract between him and Reinfried was submitted to Braden for his examination at Wichita, Kansas. The letter was addressed to Reinfried, was signed by Braden, and he asked Reinfried to accept it by subscribing his signature on the letter if he found it evidenced the true agreement between them in reference to the drilling of the well. It was known and acted upon by both of them that Braden was acting for the Braden Drilling Company and that company did the actual drilling of the well on Lot 3 in performance of the contract of Reinfried and Braden. Much of the property of the Braden Drilling Company was carried in the name of Braden and much of its business was done in the name of Braden for convenience.

Reinfried thought of attempting to put the drilling deal

together which resulted in the oil well on Lot 3 as early as November 1957. He explained the manner of proceeding to put together that kind of a deal by saying that he looked for an area around which wells had been drilled that looked like it might be productive. He then searched for three or more leasehold interests where the acreage was contiguous so that he could acquire a farm out on one leasehold, support from another in the way of acreage contribution or dry-hole money, and the same from other adjacent leaseholders. He secured the information from the Pomco map which he characterized as the working tool of putting together drilling deals. It was 2 months or more after the first contact of Reinfried with a major oil company before he was able to get the farm out from Magnolia, the acreage contribution from Sinclair, and the dry-hole support from Shell of the project concerned in this case. A letter from Magnolia dated January 7, 1958, rejecting the support requested in a proposal made to it by Reinfried and containing a counterproposal by Magnolia of the acreage described in the farm-out letter which became the agreement made by it and Reinfried in reference to a test well on Lot 3 was the first commitment he secured. He then obtained agreements with Sinclair and Shell. Reinfried then had to find someone with whom he could contract to drill the test well on Lot 3.

Slater, who represented the Braden Drilling Company, inquired of Reinfried in January of 1958 if he had any drilling deals. He said he had one and he would be glad to submit it for consideration. He did, included in which was a plat of the farm out and the support acreage which exhibited the acreage in orange on a white background and located it in Township 12 North, Range 56 West, in Kimball County, Nebraska. Later Slater said they were interested in getting the drilling deal but the terms would have to be negotiated. Reinfried asked more than the final agreement which is shown by the contract between Braden and Reinfried

for the drilling of a test well on Lot 3 as hereinbefore stated. Reinfried had his drilling deal formulated and informal commitments of a farm-out acreage from Magnolia, a farm-out contribution, and dry-hole support before he was contacted by Slater. He testified as to what Reinfried offered him: "He had to offer me three 80-acre tracts from Magnolia, one from Sinclair, and some dry hole money from Shell Oil Company, a drilling deal." Slater was asked: "What commitments had to be fulfilled before this acreage could be earned?" He answered: "We were to drill a well in Lot 3, in the approximate center of what would have been a 40-acre tract, section 20." The offer of Reinfried to Slater was expressed in these words by him: "Well, he offered it to me to drill for an override and some cash to him." The written contract between Reinfried and Braden confirms in writing just exactly what Slater says Reinfried had to sell him and the terms under which he bought it from Reinfried.

The status of Reinfried when he was approached by Slater was that Reinfried had by his sole effort formulated a drilling deal. His undertaking was to sell or dispose of it for a monetary consideration and for an overriding royalty. He accomplished this by selling the drilling deal to Braden by a contract which obligated him to pay Reinfried $500 and he was permitted to retain an overriding royalty of 4 percent of seven-eighths of the production of the acreage covered by the leases. The undertaking of Reinfried was also to see that Braden complied with the contract which provided for the drilling of the well the performance of which would be the carrying out by Reinfried of his agreements with Magnolia and Sinclair and thus he would be insured the assignment of the leases from those companies and his overriding royalty. His final undertaking was to secure and receive the assignment of the leases from Magnolia and Sinclair and the making of assignments of them to Braden by Reinfried, reserving

and retaining to him the agreed overriding royalty. Braden had no interest in the drilling deal Reinfried developed until after it had been completely formulated. Braden did not know of the existence of it before that time. He first heard of it after Reinfried had presented it to Slater. The first act of Braden in reference to the drilling deal was when he secured it from Reinfried by contract made by him and Braden upon the terms and conditions evidenced by the contract as previously recited herein. The next act of Braden's undertaking in reference to the proposed well was to pay for the drilling deal which he did by seeking and securing financial assistance from his investors. His next act in the undertaking was to pay Reinfried the $500 as provided in the contract and drill the test well on Lot 3 as required by the contract with Reinfried. His succeeding act concerning the undertaking was to secure the assignment of oil and gas leases from Reinfried to which he was entitled by the contract for the drilling of the well. The final act of Braden was to operate the properties for the benefit of himself and the investors.

It follows that the undertaking and sole concern of Reinfried was to dispose of the drilling deal he had formulated for cash and an overriding royalty. It was the undertaking of Braden to acquire and pay for the drilling deal and to drill a test well on the designated location. The undertaking of each of the parties was different than that of the other. There was no community of interest and common purpose. The interest and purpose of Reinfried was to dispose of the drilling deal he had worked up and to receive cash and override for it. The interest of Braden was to acquire the drilling deal, sell interests to investors to assist in paying for it, pay the monetary consideration for the deal, drill the well, and thereby for himself earn the entire leasehold interest in the properties other than those which he had sold and assigned to investors. It

is clear that the interest and purpose of each were not identical but entirely different. There was not an equal voice in the performance or equal control of or over the agencies of performance. It was entirely in the hands of Braden to drill the test well and Reinfried could do nothing about it but to require Braden to comply with the terms of the contract which provided for the drilling of the well. There was no obligation for the sharing of losses resulting from the drilling of the well by Braden and Reinfried. This is made conclusively clear by the statement in the brief of appellants: "Plaintiffs were to pay actual expenses for test which proved to be $29,395.43 and if test be dry they would receive $6,500.00 which mean (means) an assumed net outlay of $22,895.43 in event of failure of enterprise." In the circumstances of this case there was a failure to establish either a joint undertaking, a community of interest, a common purpose, an equal voice in performance, an equal control of agencies of performance, or a sharing of profits or losses.

In Bank of Cedar Bluffs v. LeGrand, 127 Neb. 183, 254 N. W. 892, this court said: "To constitute a partnership or joint adventure, in a legal sense, there must be an agreement to share the profits and losses." In the opinion it is stated: "A joint adventure is in the nature of a partnership and exists when two or more persons contribute cash, labor or property to a common fund with the intention of entering into some business or transaction for the purpose of making a profit to be shared in proportion to the respective contributions. There is no evidence in this case of any agreement that the profits of the farming and stock-raising business should be divided between the husband and the wife * * * (and) the question of losses was not brought up * * *."

Alexander v. Turner, 139 Neb. 364, 297 N. W. 589, states: "A joint adventure has been defined as an

undertaking by two or more persons to carry out a single business enterprise for profit."

Soulek v. City of Omaha, 140 Neb. 151, 299 N. W. 368, declares: "To constitute joint adventure, there must be an agreement to enter into an undertaking in the objects of which the parties have a community of interest and common purpose in performance, and each of the parties must have equal voice in the manner of its performance and control over the agencies used therein, though one party may entrust performance to another." In the opinion it is said: "And the absence of mutual interest in the profits or benefits is conclusive that a partnership or joint adventure does not exist."

In Rossbach v. Bilby, 155 Neb. 575, 52 N. W. 2d 747, the following is stated in the opinion: "The existence of a joint adventure is a question of fact under the evidence, and further, more convincing evidence is required to prove existence of a joint adventure where alleged joint adventure parties are the only litigants than where the controversy is between a third party and the joint adventurers. The burden of establishing the joint adventure is on the plaintiff." See, also, Kleinknecht v. McNulty, 169 Neb. 470, 100 N. W. 2d 77; Lyhane v. Durtschi, 144 Neb. 256, 13 N. W. 2d 130.

The argument that the relationship of Reinfried and Braden in reference to the enterprise of drilling a well on Lot 3 was a joint adventure is not sustained by the evidence and cannot be accepted.

Appellants argue that the status of Reinfried during his acts relating to obtaining the drilling of the test well on Lot 3 was that of a broker. This argument of appellants is based on a statement in a letter that he wrote to a representative of Sinclair in which Reinfried referred to himself as broker and on the basis that Slater in his testimony spoke of Reinfried as a broker. The letter mentioned above was not on the subject of the test well on Lot 3 but concerned another proposed

enterprise and was contained in only an incidental remark. The terminology by which a layman describes the activities of another is not always accurate and may not be indicative of the truth. In 8 Am. Jur., Brokers, § 2, p. 989, the author defines a broker in this manner: "As generally defined, a broker is an agent who, for a commission or brokerage fee, bargains or carries on negotiations in behalf of his principal as an intermediary between the latter and third persons in transacting business relative to the acquisition of contractual rights, or to the sale or purchase of any form of property, real or personal, the custody of which is not intrusted to him for the purpose of discharging his agency. Brokers have also been defined as those who are engaged for others in the negotiation of contracts relative to property with the custody of which they have no concern. They act as negotiators in bringing other persons together to bargain * * *."

In 12 C. J. S., Brokers, § 1, p. 5, it is stated: "A broker is one who is engaged for others, on a commission, in negotiating contracts relative to property with the custody of which he has no concern * * *."

In Gile v. Tsutakawa, 109 Wash. 366, 187 P. 323, it is said: "A broker is one who is engaged for others on a commission to negotiate contracts relative to property with the custody of which he has no concern." See, also, Rodman v. Manning, 53 Ore. 336, 99 P. 657, 20 L. R. A. N. S. 1158; French v. City of Toledo, 81 Ohio St. 160, 90 N. E. 160, 25 L. R. A. N. S. 748; Turner v. Crumpton & Crumpton, 21 N. D. 294, 130 N. W. 937, Ann. Cas. 1913C 1015.

The facts in this case which exhibit in detail the acts of Reinfried and the written agreements which fully express the facts of his entire conduct in reference to the exploration for oil on Lot 3 condemn the argument of appellants that he acted as a broker for anyone in reference to that enterprise. Reinfried acted as a principal concerning it. He was not an agent or

representative of anyone in disposing of the drilling deal to Braden. Reinfried acted only for himself in securing the leases and the dry-hole money and after he had assembled the drilling deal he disposed of it to Braden while acting independently and entirely for himself. Reinfried continued to act only for himself until his contract with Braden was fully completed. This contention of appellants is entirely without foundation.

The record does not support the assignment of error that the district court erred in holding that appellants pursued the wrong remedy in this case or the assignment of error that the trial court erred in refusing to "require correction as to interest assigned in leasehold, particularly as to East Half of Southeast Quarter of Section 17." There is no showing exhibited by the record that the trial court did hold that appellants pursued the wrong remedy. It is impossible to determine to what the second assignment noted above referred. The pleadings of appellants contain no basis for such correction or reformation. The prayer of the amended petition seeks no such relief. The briefs of appellants contain no discussion of the alleged error. Neither of these assignments presents anything this court can consider. Schaffer v. Strauss Bros., 164 Neb. 773, 83 N. W. 2d 543.

Appellants allege in their amended petition that there was a general custom in the oil and gas exploration and development industry whereby any person intending to drill a test well for oil and gas refrained from doing so on a location adjoining a tract of land not leased for oil and gas exploration. Appellants attempted to prove the existence of the alleged custom and that appellees knew or should have known of it before the well was commenced on Lot 3. The district court made a specific finding against appellants as to that claim. There is no assignment of error by appellants that the finding in that regard was incorrect, neither is the matter dis-

cussed in the brief on this appeal. There is, therefore, nothing this court may consider in regard to the alleged custom. Schaffer v. Strauss Bros., *supra.*

The proof offered by appellants in reference to their claim that Reinfried, or Reinfried and Humphries, were engaged by Slater, acting for Braden, to check the area around Lot 3 before the test well was commenced to ascertain if there was any acreage that was not covered by an oil and gas lease was only the testimony of Slater as follows: Sometime in between the time that the well was drilled he asked Reinfried and Humphries to check the acreage around the thing within 1 mile of that location. He could not give the dates but he said he instructed them several times before the rig was moved on the location. He later testified he asked Reinfried to check the records for the witness to see if there was any area unleased and that was at the time the agreement between Reinfried and Braden for the drilling of the well on Lot 3 was actually being reduced to writing and that Reinfried then said he would do that. Slater said that happened when the negotiations (for drilling the well) were being completed and that was the first time he had instructed it (checking the records by Reinfried). Witness was specifically asked: "* * * the first time was the time that you and Mr. Reinfried were formally reducing your agreement to writing?" The witness answered the question in the affirmative. The witness during the negotiations he had with Reinfried concerning the drilling of the well was acting on behalf of the Braden Drilling Company. Subsequently in his testimony he stated that he contacted Humphries and Reinfried not personally but by telephone, but he did not know when the first instance was that he told them to check those (records) and they agreed to do it but around the time the rig was moved on location on Lot 3 they told witness they had done it. Witness then changed "they" to "Reinfried" and said he told the witness that he,

Reinfried, had checked the records and there was no open acreage. Thereafter during the examination of the witness he said he hired Reinfried and Humphries to do day work after Braden agreed to drill it just as he hired all these brokers to check this acreage for him but there was nothing mentioned about compensation. He said the usual compensation for checking records in that area was from $25 to $50 per day and that generally when he had such work to do he employed a person who was experienced in checking records. The witness finally said there was no agreement to pay Reinfried or Humphries any monetary compensation for checking the records as the witness allegedly requested but they were to get their pay for that work from 4 percent of seven-eighths overriding royalty realized from any new lease they secured on land they found was subject to lease while they were checking the record under the arrangement made with them by Slater.

The assertion that Reinfried, or Reinfried and Humphries, were solicited or employed to make an investigation as to unleased acreage around the drill site of the test well on Lot 3 was unqualifiedly denied by them. Reinfried testified that from the time he first mentioned the drilling deal concerning the proposed test well on Lot 3 until after the well was drilled and completed, Slater made no request to Reinfried to check any acreage for Slater, and Reinfried first learned that Slater claimed that he requested Reinfried to check the area around Lot 3 in August 1958. Humphries while a witness said that he had no conversation with Slater concerning anything connected with the well which was drilled on Lot 3 until sometime in the month of August 1958, after he had heard that Slater was claiming that he had instructed Humphries to check the records for unleased acreage around Lot 3. The witness first knew this claim was in fact made when it was asserted by Slater in August 1958, when Hum-

phries was in the office of Slater. Humphries denied that he was at any time asked or instructed by Slater to check any records for open or unleased acreage around the site where the test well was drilled.

The testimony of Slater concerning the subject that he asked Reinfried to check the records for Slater to ascertain if there was any area unleased around where the test well was proposed to be drilled was that he did that at the time the agreement between Reinfried and Braden for the drilling of the well was actually being reduced to writing and that Reinfried said he would make such a check. Slater said the request was made by him and accepted by Reinfried when the negotiations for the agreement were being completed and that was the first time the subject was discussed. Slater conducted all the negotiations between his employer, the Braden Drilling Company, and Reinfried in reference to the drilling contract between them which was reduced to writing and executed by Braden for his company and Reinfried for himself. The writing which became the evidence of the drilling contract was made in the Denver office of the Braden Drilling Company which was managed by Slater. It bears date of January 25, 1958. After it was prepared it was sent to Braden at Wichita, Kansas, for his attention. He signed and transmitted it to Reinfried who executed it 1 week later. The writing became a complete contract. It specified in detail the obligations of each of the parties to it. It was delivered, became effective, and was fully performed according to its terms. It contained no provision obligating Reinfried to do any checking or investigating concerning any land. The real estate covered by the oil and gas leases involved in the transaction were precisely described in the written agreement, and Lots 1 and 2 of Section 20 were not mentioned. Those lots were entirely excluded and were wholly unconcerned in the transaction. Braden sought, obtained, retained, and acted upon writings from Rein-

fried, which were composed and written by Slater, concerning modifications of the well-drilling contract in respect to the time of the commencement date of the well. These writings expressly affirmed all other terms and provisions of the drilling contract and stated they should remain as they were originally written. The last of these writings was more than a month after the drilling agreement was prepared but no effort was made to add to it a provision concerning checking for unleased areas around the drilling site. These facts detract from the quality of the testimony of Slater.

In another part of his testimony Slater said he asked Reinfried and Humphries to check the acreage around the location of the well and to purchase any lease they could obtain on any unleased land they found; that Braden would buy the lease; and that Reinfried and Humphries would receive their override the same as they did in the original deal. Slater did not tell them how much they could pay for a lease on any new acreage. The witness stated he instructed them in this regard several times. He could not state the dates this was done but did say it was before the rig was on location.

Humphries was not interested in any manner in the drilling deal concerning a test well on Lot 3. He did not claim nor was he entitled to any override involved in that enterprise. Humphries had no business transaction with Reinfried concerning any oil business such as is involved in this case at or prior to the time designated by Slater as before the rig was moved on location. In fact Humphries had no business transaction with Reinfried except they each paid one-half of the expense of the office space they respectively occupied but each had and conducted his own separate business and neither had any interest in the business of the other before April 1, 1958, at which time the partnership of Humphries-Bradish-Reinfried was organized. Humphries had no specific information about the drilling

deal of Reinfried described herein at the time last above designated by Slater. It was not at all probable that Humphries would have obligated himself to check the acreage within a given radius of a specified location when he had no interest in and only slight information of the transaction involved and could not profit therefrom. Humphries did not claim any skill for or experience in that kind of investigation work. Slater said it had been the previous practice of Braden Drilling Company when it had checking of public records to be done to employ an experienced person in that field to do it, generally on the basis of day work at an expense of from $25 to $50 per day.

Slater further testified he contacted Reinfried and Humphries concerning checking the area around Lot 3 when the deal was consummated in February. Soon after making that statement Slater said that Reinfried was employed by Braden to check the acreage around the location of the test well; that he was to be compensated for his employment by day work; and that he, Slater, would not have been surprised if Reinfried did not ever send him, Slater, a bill for it. When Slater was asked the exact terms of the hiring by him of Reinfried and Humphries he said they were hired just like all those brokers. He asked them if they would check this acreage for him and they said they would. There was nothing mentioned about the compensation that would be paid. Slater was asked if Reinfried was to do the checking for nothing and he said: "I don't know, there wasn't anything talked about it, but they could have sent me a bill, they could not have sent me a bill. I've done things for people at times that I've turned deals to as a favor without ever billing them for it." The testimony of Slater on the subject discussed above was equivocal, uncertain, unsatisfactory, and in some respects contradictory. It was not of the quality required to even tend to show, much less to establish,

justification for a finding of or a decree for the imposition of a constructive trust.

It is and has been the consistent doctrine of this court that the burden of proof is on one seeking to establish the existence of a constructive trust to do so by evidence that is clear, satisfactory, and convincing. Wiskocil v. Kliment, 155 Neb. 103, 50 N. W. 2d 786; Bailey v. Karnopp, 170 Neb. 836, 104 N. W. 2d 417.

There is a fact in the record which indicates that Braden or Slater did not think that checking for un-leased land near Lot 3 was of such tremendous importance when the drilling contract was being nego-tiated and consummated as they have attempted to make it appear in this litigation. The fact is that Braden had and examined abstracts of title to the land actually involved in the drilling deal concerning Lot 3 and the abstracts he was furnished covered the title to Lots 1 and 2 adjoining Lot 3. Braden was asked this question: "Then, you are prepared to make the flat statement that some of the abstracts did cover Lots 1 and 2?" The answer of Braden was an unqualified "Yes." Braden did not say he examined the abstract to Lots 1 and 2 but he had an opportunity to do so. It may be that Slater and Braden relied on the Pomco map which showed that Magnolia had a lease on Lots 1 and 2 when the drilling contract was negotiated and consummated just as Reinfried did. It could be that the idea that Reinfried would do the checking for un-leased land was an afterthought when it was learned that he had secured a lease on Lots 1 and 2 and Slater was proclaiming by telephone and otherwise that there was sure to be a lawsuit involving that lease.

Appellants contend that all contacts in carrying out the terms of the contracts with Magnolia and Sinclair on the one hand and Braden on the other hand were handled through Reinfried and because of this he stood in a fiduciary relationship. The record does not sus-tain this. The fact as established by the record is the

very antithesis of this contention. All the instruments and writings between Reinfried and Magnolia and Sinclair are in evidence and there is nothing in them showing any communications from Reinfried to either of the oil companies in reference to any of the matters required by the contracts with them and there was no offer of proof of any communication other than what is contained in the contracts concerning what the companies should do. The record shows that each of the participants in arranging for and accomplishing the drilling of a test well knew exactly what the facts were, what each was obligated to do, and what each was to receive if the enterprise was successful in producing an oil well or if the result proved to be a dry hole. Each of the participants acted independently and at arm's length with each other. Each was bound by a definite, complete, and clear written agreement and the provisions of each of the contracts were fully performed. The agreement between Reinfried and Magnolia was dictated and written by the latter and the farm out was definitely described therein. It did not include Lots 1 and 2 and there is no claim that anyone interested in the exploration for oil understood that it did. That agreement was the measure of the rights and obligations of the parties to it. The acreage contribution agreement between Sinclair and Reinfried was prepared by Sinclair and it definitely described the land covered by the lease. It was contributing to support the farm out made by Magnolia as assistance in having a test well drilled on Lot 3. That agreement was the measure of the rights and obligations of the parties to it. Shell, at the solicitation of Reinfried, made a dry-hole commitment to assist in having a test made on Lot 3 but Shell insisted that the amount thereof be paid, if and when the conditions of the commitment were complied with, directly to Braden. Hence the contract concerning it was made by Shell and Braden and it fixed the rights and obligations of the parties in

reference to that contribution. The contract between Reinfried and Braden for the drilling of the well on Lot 3 was complete, definite, and unambiguous in providing for the rights and obligations of the parties to it. It described by legal description the land covered by the leases contributed by Magnolia and Sinclair and it described the dry-hole contribution of Shell. There was no requirement, place, or function for an intermediary between the parties or any of them who were participating in this enterprise. The rights and obligations of each were contractual and no one of them acted for or represented any of the others except to perform the contract or contracts by which he was bound.

Reinfried depended upon the correctness of the representations of the Pomco map to the effect that the land around Lot 3 was covered by oil and gas leases. This, according to the record, is the practice generally among persons engaged in the exploration and development of the oil industry unless there is something which appears to challenge the correctness of the map. An inquiry by a representative of Sinclair to Reinfried late in June or early in July 1958, after the oil well on Lot 3 had been completed, resulted in the latter telling the former that the map showed that Magnolia had a lease on Lots 1 and 2. Later the representative told Reinfried that Magnolia reported it did not have such a lease. Reinfried then inquired of Shell if it had a lease on the lots and he was advised that Shell did not. Reinfried then investigated at Kimball and satisfied himself that Lots 1 and 2 were not leased for oil and gas exploration. He secured such a lease thereon which was dated July 7, 1958. He took the lease in his name and recorded it in the public records of Kimball County. It is not important how he became advised that Lots 1 and 2 were not covered by an oil and gas lease. What is important and decisive is that there was no relationship between any of the

appellants and any of the appellees which required the latter to share the lease on Lots 1 and 2 with appellants. The object of this litigation is in effect to have Lots 1 and 2 added to the description of the real estate described in the drilling contract made by Braden and Reinfried under the terms of which the oil well on Lot 3 was drilled.

If there had been a fiduciary relationship between Reinfried and the appellants or any of them, this fact would not, under the circumstances of this case, necessarily entitle appellants to an adjudication of a constructive trust.

In Warner v. Winn, 145 Tex. 302, 197 S. W. 2d 338, the court said: "A contract which provided for the development of certain specified and carefully described areas, held under named and well defined leases for the production and sale of gas from those tracts, constituted the full agreement between the parties, and the equitable rule that persons engaged in a common enterprise by way of joint adventure stand, within the scope of the enterprise, in a fiduciary relation each to the other, will not be extended so as to forbid the acquisition, ownership or development by one of the parties for his own benefit of property not embraced in the enterprise and outside of the scope of the contract. * * * To invoke the equitable rule that persons engaged in a joint enterprise stand in a fiduciary relation to each other and be bound by the strict standards of good conduct and fair dealing with each other, there must be some act showing the intention of one or the other of the parties to acquire, for his own benefit, property belonging to the joint enterprise, to use the funds of such enterprise for his own gain."

In British American Oil Producing Co. v. Midway Oil Co., 183 Okl. 475, 82 P. 2d 1049, it is stated: "The plaintiff discusses at length the rules applicable to a fiduciary relationship, the duties of a trustee to his cestui que trust, and the requirements of loyalty to a coadventurer.

Those principles apply here, but only as applied to the property involved and the existing property rights. Here each party owed a high degree of loyalty to the other, as applied, however, to the assembling of leases and the drilling and developing of the specified area involved, and the further duty of faithfully accounting for the income. As to those matters, the parties did not deal at arm's length, but trusted and relied upon each other. British American owed to Midway a high degree of loyalty, diligence, and fidelity, and that will not consciously be lowered by any judgment of this court. But when every such duty has been discharged in full, no court has the right to enlarge the duty of British American and create new rights in Midway by decreeing to Midway a share of profits made by British American from a private risk in a separate enterprise. This cannot be fairly done even in the name of a fiduciary relationship, or a trust relationship, however sacred in the law are those relationships, and the duties and rights arising therefrom when properly analyzed, applied, and enforced."

The relief appellants seek in this litigation is that the court impose a constructive trust upon the interest of appellees in the property described in the prayer of the amended petition of appellants.

In Jenkins v. Jenkins, 151 Neb. 113, 36 N. W. 2d 637, this court said: "A constructive trust is a relationship with respect to property subjecting the person by whom the title is held to an equitable duty to convey it to another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property. * * * The law is well established that each case is to be determined from the facts, circumstances, and conditions, as presented therein." See, also, Wiskocil v. Kliment, *supra;* Vielehr v. Malone, 158 Neb. 436, 63 N. W. 2d 497.

This is an equity case and the trial in this court is

de novo. Wiskocil v. Kliment, *supra;* Bailey v. Karnopp, *supra.* The evidence is not of the quality required to establish a case justifying the imposition of a constructive trust in favor of appellants in respect to the property involved. The judgment should be and it is affirmed.

AFFIRMED.

Note: This opinion was adopted by the court on January 3, 1961.