LINCOLN GRAIN, INC., Appellant,

v.

AETNA CASUALTY AND SURETY COMPANY, A Corporation, Appellee.

No. 84-1373.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 10, 1984.

Decided March 6, 1985.

David M. Geier, Lincoln, Neb., for appellant.

Richard A. Knudsen, Lincoln, Neb., for appellee.

Before HEANEY, Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Lincoln Grain, Inc. appeals from a judgment in its favor against Aetna Casualty & Surety Company for approximately $44,-000, claiming that it should have recovered $1.5 million on its fidelity bond claim. The district court[1] held that a "trading loss" exclusion limited Lincoln's recovery. We conclude that the district court did not err in applying the exclusion and affirm its judgment.

Lincoln Grain's primary business is trading grain. This litigation centers on its Iowa Division, which bought and sold grain delivery contracts on its own behalf. Although it took title to the grain it bought and sold, it did not take possession. The grain remained in various outside elevators until the Iowa Division could arrange for shipment from the elevators to the buyers. The division's profits rested on its ability to sell delivery contracts at prices higher than it had paid for them. Lincoln Grain also had a Commodities Division, which did not buy or sell grain on its own behalf, but executed the orders of trading customers. Title to this grain rested solely in these customers.

In 1971, Aetna issued a fidelity bond to Lincoln that insured against fraudulent or dishonest acts by Lincoln employees. An employee named William Oler became general manager of the Iowa Division in 1973. Beginning in May of that year, Oler took responsibility for reporting the division's financial status to Lincoln headquarters. These reports were based on valuations of the division's inventories, determined solely by Oler. During July and August 1973, Oler found that the Iowa Division had suffered substantial losses. Disbelieving these signs, Oler altered his financial reports to show a profit, hoping that later inventories would prove him correct. These practices continued for two and a half years before they were detected. Eventually it was discovered that poor trades and hedges had resulted in losses of around $2.6 million.

Meanwhile, in October 1973 Aetna had begun to negotiate with Lincoln concerning the addition of a trading-loss exclusion to the fidelity bond. In June 1974, after considerable correspondence between the parties,[2] Lincoln had accepted such an exclusion, effective April 1, 1974. Aetna had indicated that it would not renew Lincoln's bond unless the trading-loss endorsement (Endorsement 32) was added. This endorsement contained three critical provisions. First, the following words were printed at the top of the endorsement:

WHEN ISSUED TO ANY COTTON, COFFEE, GRAIN OR OTHER COMMODITY BROKERAGE HOUSE, TO

---

1. The Honorable Warren K. Urbom, Chief Judge, United States District Court for the District of Nebraska.

2. By letter dated October 19, 1973, Lincoln Grain's insurance agent, Leo Beck, asked Aetna whether the proposed endorsement would cover "the dishonest act on the part of an employee who is involved in trading losses with the employer's money, or the employer's credit." About one month later, Aetna responded:

"The trading loss exclusion * * * directs itself to trading operations. Essentially, it excludes trading losses that an insured may sustain in their [sic] hedging operation as a result of an unauthorized transaction by an employee with or without provable dishonest or fraudulent intent."

EXCLUDE TRADING LOSSES WHETHER IN THE NAME OF THE INSURED OR IN A GENUINE OR FICTITIOUS ACCOUNT.

Second, Lincoln Industries, Inc.[3] was the named insured. Finally, the body of the endorsement provided: "It is hereby agreed that: 1. Insuring Agreement I [employee dishonesty coverage] does not apply to any loss resulting directly or indirectly from trading, whether in the name of the insured or in a genuine or fictitious account.

Lincoln submitted a claim under the fidelity bond for the losses incurred by the Iowa Division, based on Oler's dishonest reports, which prevented it from closing down the division on September 30, 1973. The claim gave rise to this diversity action. Based on the pretrial stipulations of the parties, the court framed the issues as:

> Whether Lincoln Grain, Inc. or the Iowa Division of Lincoln Grain, Inc. was a cotton, coffee, grain or other commodity brokerage house, and if not, whether Endorsement 32 applied to Lincoln Grain, Inc. or the Iowa Division of Lincoln Grain, Inc.

> Whether the losses alleged by the plaintiff resulted directly or indirectly from trading as provided by Endorsement 32 to the bond.

*Lincoln Grain, Inc. v. Aetna Casualty Insurance Co.,* No. CV77–L–102, slip op. at 11 (D.Neb. Feb. 16, 1984). The court found that the caption read together with the exclusion created an ambiguity. Interpreting the policy in light of extrinsic evidence, the court concluded that the endorsement covered Lincoln Grain as a whole, including the Iowa division. Thus, the court held that the trading-loss endorsement excluded the major portion of the claim.

On appeal Lincoln argues that the court erred in identifying and resolving the ambiguity raised by the caption. Aetna does not argue here that Oler's conduct was not "dishonesty" within the meaning of the bond. Lincoln contends, however, that the district court incorrectly concluded that the ambiguity was in the identity of the insured rather than the definition of the risk excluded. It argues that "commodity brokerage house" modifies the type of risk ("trading losses") rather than identifying the entities covered such that the endorsement applies only to trading losses sustained in commodity brokerage trading. Thus, Lincoln claims its losses should not have been excluded because the Iowa Division was not a "brokerage" since it did not deal in the property of others for commission. *See Carey v. Humphries,* 171 Neb. 578, 597, 107 N.W.2d 20, 31 (1961). Finally, Lincoln claims that the district court erred in concluding that Lincoln Grain as a matter of law was a commodity brokerage house.

■ The district court did not err in identifying or resolving the ambiguity raised by the caption. It found that Oler's conduct resulted in trading losses, in that these losses resulted from poor judgments in the buying and selling of grain delivery contracts. In reaching this conclusion, the court properly relied on common understandings in the industry. *See* note 4 *infra; Research Equity Fund v. Insurance Co. of North America,* 602 F.2d 200, 201 (9th Cir.1979), *cert. denied,* 445 U.S. 945, 100 S.Ct. 1344, 63 L.Ed.2d 780 (1980). Lincoln's argument that these losses were not a result of trading by a commodity brokerage house rests on an overly restrictive interpretation of the caption and ignores the remainder of the exclusion.

According to Lincoln's interpretation of the caption, only losses suffered by the Commodities Division would be excluded by the caption. Contrary to Lincoln's suggestion, however, the caption does not say that the endorsement excludes commodity brokerage trading losses. Rather, the caption states that when the endorsement is issued

---

**3.** When the endorsement took effect, Lincoln Industries, Inc. was the parent company under which the Iowa and Commodities Divisions operated. Later, Lincoln Grain, Inc. became the parent company. The district court found that Lincoln Grain and Lincoln Industries were interchangeable for the purpose of determining coverage.

to a commodity brokerage house, trading losses are excluded. It is true that a portion of Lincoln's trading was undertaken on its own behalf (the Iowa Division's buying and selling). Nevertheless, Lincoln also engaged in commodity brokerage (the Commodities Division's trading the properties of its customers). Both divisions were capable of suffering trading losses.

■ In considering the endorsement as a whole, the district court interpreted the caption as raising an ambiguity. Lincoln, in contrast, treats the caption as the sole dispositive provision in the endorsement. This position ignores the remainder of the endorsement and the extrinsic evidence. *See* J. Appleman & J.A. Appleman, 12A *Insurance Law and Practice* § 7387, at 168–69 (1976) (caption should be read with the contract as a whole and construed to carry out the parties intent). After considering the caption, endorsement, and extrinsic evidence, the district court applied the endorsement to Lincoln Grain and all its divisions rather than only the Commodities Division. The following reasons support the court's conclusion.

■ First, the endorsement was issued to Lincoln Grain, not just the Commodities Division. *Lincoln Grain*, slip op. at 14. Second, there was significant correspondence between the parties concerning the scope of the endorsement. The district court found no suggestion in this correspondence that the endorsement covered only the Commodities Division.[4] Finally, and most importantly, the body of the endorsement "does not limit the exclusion's application to brokerage houses or any part of Lincoln Grain's overall operations." *Id.* at 15. Rather, the endorsement excludes trading "whether in the name of the insured or in a genuine or fictitious account." This language answers Lincoln's argument that only trading by a commodity brokerage house, or trading of property of others,

is excluded. Based on these factors, the court concluded that "Lincoln Grain's interpretation of the insurance contract is not one which a reasonable insured in Lincoln Grain's position and with Lincoln Grain's knowledge would adopt." *Id.* at 17. The court found that the endorsement covered all the operations of Lincoln Grain rather than just the Commodities Division. These are factual findings because extrinsic evidence was utilized to interpret the ambiguous contract. *See West v. Smith*, 101 U.S. 263, 270, 11 Otto 263, 270, 25 L.Ed. 809 (1879); *United Truck & Bus Service Co. v. Piggott*, 543 F.2d 949, 950 (1st Cir.1976); *Palmer v. Howard*, 493 F.2d 830, 835 (10th Cir.1974); *Olds v. Jamison*, 195 Neb. 388, 390–94, 238 N.W.2d 459, 462–63 (1976). The findings are neither clearly erroneous nor a mistake as a matter of law. The court did not err in rejecting Lincoln's effort to carve out a portion of its corporate entity, the division engaged in commodities brokerage on behalf of customers, to be subject to the exclusion.

Lincoln also argues that the district court erred in finding Lincoln Grain a commodity brokerage house as a matter of law. The court found that Lincoln Grain as a whole was a brokerage house in part because either George Lincoln (the president of the company) or Lincoln Grain held a brokerage license. Lincoln argues that this finding is erroneous, in that Lincoln held only a seat on the Chicago Board of Trade rather than a license. Because the court's holding can be supported by other reasons in the record, we need not decide whether this narrow finding is mistaken. Moreover, we reject Lincoln's argument that the district court reached this conclusion "as a matter of law." The court's discussion of this issue was but a small part of the larger factual determination of

---

**4.** Lincoln relies on the letter from Aetna dated October 19, 1973. Lincoln claims that it referred to only its Commodities Division as a "hedging operation," so the letter shows that the endorsement was not meant to cover the Iowa Division. The district court rejected this argu-

ment, relying on expert testimony that under industry usage, the Iowa Division would be considered a "hedging operation" because it made hedging decisions, rather than merely executing customer hedging-orders.

whether the endorsement was intended to include Lincoln Grain as a whole.

We affirm the judgment of the district court.